## THE PEOPLE *v.* THOMAS B. POOL.

JUSTIFICATION OF A HOMICIDE.—The right to take life in defense of one's person, habitation, or property, or for the protection of those whom by the law of nature he is bound to protect, is founded on necessity; and when this defense is interposed in justification of a homicide, the first inquiry is as to the alleged necessity.

SAME.—If an officer in fresh pursuit of criminals comes suddenly upon several of them, and calls out "You are my prisoners—surrender;" and at the same time points a gun towards them, they are not justified in firing on him, or in taking his life.

SAME.—If several persons commit a robbery, and immediately flee from the scene of it, and are pursued soon after by an officer, who overtakes them at a distance of ten or twelve miles from the place where the crime was committed, and is slain by them in an attempt to arrest them, on the trial for the homicide the People may introduce evidence of the robbery, and the defendant's connection with it.

PROOF OF INTENT WITH WHICH HOMICIDE WAS COMMITTED.—In ascertaining the degree of guilt of one who has committed a homicide, it is important to determine the intent with which the act was done. The intent may be proved by evidence, direct or circumstantial, tending to establish the fact.

ACT OF ONE CONSPIRATOR THE ACT OF ALL.—If several persons conspire together to commit a robbery, and to resist arrest even to the taking of life, and after the robbery is committed take the life of an officer in resisting an arrest, whatever is said or done by any one of them in furtherance of the common design is a part of the *res gestæ*, and the act of all.

NOTICE BY AN OFFICER OF HIS OFFICIAL CHARACTER.—Where a party is apprehended in the commission of an offense, or upon fresh pursuit afterwards, notice of the official character of the person attempting to make the arrest, or of the cause of the arrest, is not necessary.

ARREST WITHOUT A WARRANT.—A peace officer may, without a warrant, arrest a person for a felony he has committed—though not committed in the officer's presence—when the criminal is fleeing from the scene of the crime.

SAME.—The words "when he is pursued immediately after an escape" in the one hundred and thirty-seventh section of the Practice Act, are not used in the sense of an escape from custody, but in the sense of flight from the scene of the crime;

and the words "immediate pursuit," are the same as "fresh pursuit" used in common law phrase in criminal cases.

WHAT IS IMMEDIATE OR FRESH PURSUIT OF CRIMINALS.—If, after the commission of a felony, the guilty parties flee to avoid an arrest, and within three or four hours are pursued by officers for the purpose of apprehending them, and the officers by diligent pursuit overtake them at a distance of twelve miles from the place where the crime was committed, this is an immediate or fresh pursuit of the criminals.

STATUTE DEFINING MURDER IN THE FIRST DEGREE. — The adjectives "wilful" "deliberate," and "premeditated," considered in connection with the context in the phrase "or any other kind of wilful, deliberate, and premeditated killing," found in that section of the Act concerning crimes and punishments defining murder in the first degree, are merely cumulative and expressive of the same idea.

ROBBERY.—If the Court in its charge to the jury characterizes the crime of robbery as an " outrage," it is not calculated to prejudice the cause of the defendant, or do him an injury.

CHARGE TO JURY AS TO THEIR VERDICT. — To charge the jury that they " have the *power* to find the defendant guilty of murder in the first degree, murder in the second degree, or manslaughter, or not guilty," is the same in effect as to charge them that it is their province so to find.

DEFINITION OF MURDER.—Each of the phrases, " wilful killing," "deliberate killing," and " premeditated killing," standing in relation to the offense of murder, embraces, essentially, the legal idea of the other.

APPEAL from the District Court, Eleventh Judicial District, El Dorado County.

The facts are stated in the opinion of the Court.

*James Johnson,* for Appellant.

*J. G. McCullough, Attorney-General,* for the People.

By the Court, CURREY, J.

The defendant was indicted with others for the murder of Joseph M. Staples, committed on the first day of July, 1864, at a place called Somerset House, in El Dorado County. The defendant plead not guilty. On the trial it was proved that at about ten o'clock of the evening of the day previous, the defendant with thirteen other persons stopped two stage coaches which were on their way from the then Territory of Nevada to Placerville, in the County of El Dorado, and by violence took from one of them a large amount of gold— gold coin and bullion—which was in the custody of the person

having charge of the coach in which the same was when taken. The scene of the robbery was about twelve miles from the Somerset House, and about fourteen miles from Placerville. Soon after the stage coaches arrived at the latter place, and the deceased, who was a Deputy Sheriff of El Dorado County, became informed of the robbery, he and a constable started in pursuit of the robbers, and at about five o'clock the next morning came upon some of them at the Somerset House, where they were together in a room, and finding a gun standing at the door of the room the deceased took it into his possession, and then opening the door addressed the defendant and his companions, saying to them : " You are my prisoners—surrender ;" and at the same time pointing toward them the gun which he held in his hands, while they, on their part, instead of surrendering, drew their pistols and opened fire on the deceased. Several of the shots took effect upon a vital part of his body, causing his death in a few minutes. After the firing had been commenced by those in the room, the deceased shot the defendant, by which he was disabled.

The defendant was found guilty of the murder of Staples, and was sentenced to be executed. From this judgment he has appealed, and counsel on his behalf asks this Court to reverse the judgment on several grounds, which we have carefully considered, and concerning which we will now pronounce our judgment.

I. It appears from the evidence in the case that Staples did not, at the time he attempted to arrest the defendant and his companions, inform them in terms of his official character, nor the cause for the attempted arrest, and it is therefore argued on the defendant's behalf that the homicide was justifiable.

A false and mischievous notion seems to have obtained to a considerable extent that a person may justify or excuse the slaying of his fellow being for causes which fall far short of any exigency from which it may be lawfully presumed the act of the slayer was necessary for the defense of his person, habitation, or property, or for the protection of those whom by

the law of nature he is bound to protect and defend. The right of defense in the cases indicated is founded on necessity, and when sought to be interposed in justification of the act, the first inquiry is as to the alleged necessity. Then, were it assumed that the defendant and the men with him were innocent of the crime for which the deceased sought to arrest them, and ignorant of his official character, could it be said they were justified by the circumstances which transpired in taking his life ? He had it in his power to shoot, at the moment he informed them that they were his prisoners and demanded their surrender, and yet he did not exert such power; besides which, his language and menace, as associated, was calculated to convey the idea that he did not design violence if they would heed his demand. The circumstances, in our judgment, did not, even on the hypothesis stated, justify or excuse the taking of the life of the deceased. But whether the crime committed was of the magnitude of murder in the first degree, depends upon the entire circumstances of the case.

The defendant objected to the evidence offered and given at the trial in relation to the robbery, and now insists that the Court erred in permitting any examination as to that offense and the defendant's connection with it. In our view of the matter it was material for more reasons than one :

First—To show that the defendant was engaged in the commission of the robbery, and that he and his confederates had a motive beyond their own protection, as men innocent of crime, in killing the deceased while in pursuit of them.

Second—To show that in connection with their criminal purpose, they had agreed to resist being arrested even to the death, and that being confederated together for the felonious purpose of robbery and resistance to the civil power of the State, the killing of the deceased, by whichever of them actually done, was the act of each and all of the conspirators.

Third—To establish a condition of circumstances from which the robbers would be deemed to have sufficient notice that their pursuers were officers of the law, or citizens in pursuit of them as malefactors.

(1.) In ascertaining the degree of guilt of one who has committed a homicide, it is always important to ascertain the *animus* with which the act was done. It is the intent with which an act was done that constitutes its criminality. The intent and act must both concur to constitute the crime. And the intent must therefore be proved. The proof may be either by evidence, direct or indirect, tending to establish the fact, or by inference of law from other facts proved. (3 Greenleaf's Ev. Sec. 13 ; 1 Bish. Cr. Law, Secs. 253 to 257 ; *Fowler* v. *Padget*, 7 Term R. 514.) Whenever it is important to determine the character of the act perpetrated and to ascertain the intent of the accused, the existence of any motive likely to instigate him to the commission of the crime may be proved, and is relevant and competent for the purpose of fixing or tending to fix the crime upon him. (1 Stark. Ev. Secs. 13 and 14; Wharton's Cr. Law, Secs. 635 and 850.)

(2.) By the act of the defendant's conspiring with those who were with him when the deceased was slain, to commit robbery and to resist arrest even to the taking of life, they jointly assumed to themselves, as a body, the attribute of individuality, so far as regarded the prosecution of the common design, thus rendering whatever was done or said by any one of them in furtherance of that design a part of the *res gestæ*, and therefore the act of all. (3 Greenleaf's Ev. Sec. 94.)

(3.) Where a party is apprehended in the commission of an offense, or upon fresh pursuit afterward, notice of the official character of the person making the arrest or of the cause of the arrest is not necessary, because he must know the reason why he is apprehended. Cases are not wanting to support this doctrine. In the case of *Rex* v. *Davis*, 7 Car. and Payne, 785, where it appeared that a gamekeeper, with a servant of his master, were out at night and heard two guns fired, and went toward the place and got into a covert and saw some men there, who ran away, and the servant pursued them and got close up to one of them and attempted to arrest him, and was immediately shot through the side, Baron Parke said : " Where parties find poachers in a wood, they need not give any inti-

mation by words that they are gamekeepers or that they come
to apprehend; the circumstances are sufficient notice. What
can a person poaching in a wood suppose, when he sees
another at his heels?" So in the case of *Rex* v. *Whithorne,*
Perry and Smith, charged with the murder of Richard Rounce,
(3 Car. & P. 394,) it appeared that Rounce, with other game-
keepers, found Perry and Smith out for the purpose of catch-
ing hares and arrested them. The persons so apprehended
soon after called to Whithorne, who came up, and with a stick
shod with iron, beat the gamekeepers on the head, killing
Rounce, and rescuing Perry and Smith. For the prisoners it
was objected, that as the gamekeepers did not announce to the
prisoners who they were, the arrest was illegal, and further,
that as their duty was to apprehend merely, and it was in
proof that they beat the prisoners, that would reduce the
offense to manslaughter. To this the Court answered that
with respect to the keepers not announcing who they were,
there was no pretense for saying the prisoners did not know
that perfectly well. They did not make any question of their
authority. They did not say, " You have no right to take us.
Who are you?" or anything of that sort. The apprehension
was legal, and being so, all the legal consequences must follow.
So also in *Rex* v. *Payne,* 1 M., C. C. R. 378. Certain game-
keepers, upon hearing the report of guns, went towards the
place from whence the sound came. The prosecutor saw six
persons in the wood who were poachers, and with a cocked
pistol ran after them as they ran away. After running about
fifty yards, they made a stand. One of them shot the prose-
cutor while he was pursuing. The prosecutor said nothing to
them nor they to him before he was shot. At the trial for
maliciously wounding the prosecutor, it was objected for the
prisoners that inasmuch as the prosecutor's authority to appre-
hend the prisoners was derived from the Act creating the
offense for which he attempted to arrest them, it was incum-
bent on him to give them notice of his authority. The objec-
tion was overruled, and upon a case reserved, the Judges

73

were of opinion that the circumstances constituted sufficient notice.

In the case of a public officer such as a Sheriff or a constable, acting in his own district, his authority to make arrests of persons who have recently committed crimes, is to be deemed a matter of notoriety. (Roscoe's Cr. Ev. 754.) The robbers were in the act of fleeing with a portion of the spoils of their crime committed several hours previous, and the deceased and the constable with him were at their heels in fresh pursuit. The circumstance of having committed the crime of robbing the stage coach was sufficient to cause them to apprehend pursuit. That they were aware they were pursued appears by the evidence of one of the party, who testified that Bulwer, one of the robbers, who occupied another room, came to the room in which the defendant and others were, and waked them and told them to get up—that somebody was after them. This was just before the deceased came to the door. After Staples was killed the firing was kept up until the constable surrendered. It was after this the constable told them he was an officer, and they demanded of him to show his authority, and asked him "How in hell did you find us so soon?" The deceased, upon entering the door where the defendant and his confederates were, addressed them, "You are my prisoners—surrender." These words were, according to the authorities, a sufficient notice of his character as a peace officer. (Roscoe's Cr. Ev. 755 ; 1 Russ. on Crimes, 627 ; 1 Hale's Pleas of the Crown, 461 ; *Mackalley's Case*, 9 Coke R. 68 *b*, and 69 *a*.)

It is provided by statute that a peace officer may, without a warrant, arrest a person for a felony which he has committed, though not committed in his presence; and also where a felony has in fact been committed, and the officer has reasonable cause for believing the person arrested to have committed it. (Laws 1851, p. 226, Sec. 134.) The one hundred and thirty-seventh section of the same statute provides that when arresting a person without a warrant, the officer must inform him of his authority, and the cause of arrest, except when he is in the actual commission of a public offense, or when he is pursued

immediately after an escape.  The word *escape* we do not understand to be used in the technical sense of an escape from custody, but rather in the sense of flight from the scene of the crime to avoid being arrested and brought to justice.  Even a private person may arrest one who has committed a felony, without a warrant and without informing him of the cause thereof, provided such arrest be made on pursuit immediately after the commission of the offense.  (Laws 1851, p. 227, Sections 140, 141.)  It would be strange indeed if conditions, stricter and more ceremonial, were imposed on peace officers in such cases than upon private persons.  What is meant by pursuit immediately after an escape or immediately after the commission of the offense?  Immediate pursuit is substantially the same as fresh pursuit, so frequently used in common law phrase in criminal cases.  The phrase " when he is pursued immediately after an escape," is not to be taken so strictly as to defeat its reasonable operation.  (1 Russ. on Crimes, 606, 607.)  The interval which may elapse between one event and another may, in a particular instance, be sufficient to destroy their relations as immediate in time, while as to two other events the same interval would not have such effect.  For example, if one living near the Post Office should call there for a letter and there remain an hour before his return to his own place, it could not be said he returned immediately; but if he should visit a foreign country, and there remain only for a few days and then thence depart on his return homeward, it might with propriety be said his return was immediate.  Thus it is seen that immediate is a word of relation, and as a measure of time is itself governed in degree by the events and circumstances to which it stands in a qualifying connection.

The conclusion to which we come upon the questions considered are :

1st.  That the crime of robbery was committed by the defendant and others, and that the deceased and the constable with him were in the immediate or fresh pursuit of the robbers, for the purpose of apprehending them for the felony they had perpetrated, when the homicide was committed.

2d. That the defendant and his companions in the crime of robbery were aware at the time of the cause for which they were pursued, and had in legal contemplation notice of the character of their pursuers. ℣ ℟.

3d. That the testimony, taken as true, established the fact that the defendant as a conspirator with others to commit the crime of robbery, and to resist apprehension therefor even to the taking of life, was concerned in the unlawful killing of the deceased, Joseph M. Staples, while in the discharge of his duty as a peace officer in the County of El Dorado, and that the circumstances of the homicide showed that the act was done with an abandoned and malignant heart.

II. The defendant complains that the charge of the Court to the jury was erroneous in several important particulars, by which his cause was or may have been prejudiced. If this be so, the judgment should be reversed, notwithstanding the evidence, under proper instructions, might be deemed sufficient to support a verdict of guilty of murder in the first degree.

(1.) In defining murder in the first degree the Court charged the jury that "all murder which shall be perpetrated by means of any poison, or lying in wait, torture, or any other kind of wilful, deliberate *or* premeditated killing, or which shall be committed in the perpetration or attempt to perpetrate any arson, rape, robbery or burglary, is murder of the first degree. All other kinds of murder shall be deemed murder of the second degree." This charge is substantially in the language of the statute, except that the words "wilful, deliberate and premeditated" are disjoined by the word "or," instead of being conjoined by the conjunction "and," as in the statute. The effect of the charge in this particular is that either a wilful, deliberate or premeditated killing of a human being is murder in the first degree. These adjectives are severally expressive of the same idea. An act done wilfully is done designedly or of set purpose; an act performed deliberately is performed with careful consideration or after examination and reflection; and an act premedi-

tated and then committed must be understood to be precon-
certed, intended or meditated beforehand.  In the sentence
referred to, the words "wilful, deliberate and premeditated,"
as connected with the subject to which they relate, if intended
to be conjoined, may be regarded as cumulative, and merely
giving force to the subject matter by successive expressions of
the same idea.   In 1 Wharton on Criminal Law (Sec. 1,084)
it is said : "In Pennsylvania, New Jersey, Virginia, Alabama,
and Michigan, the killing, to commit murder in the first de-
gree, must be 'wilful, deliberate and premeditated.'   The
omission of 'wilful' in New Hampshire, and the addition of
'malicious,' in Tennessee, cannot, it is apprehended, vary the
construction given to the statutes."   (*Dale* v. *The State*, 10
Yerg. 551; 1 Whart. Cr. Law. Secs. 1,085, 1,114.)   But the
word *and* is not always to be taken conjunctively.   It is some-
times, in a fair and rational construction of a statute, to be read
as if it were *or*, and taken disjunctively; and in the statute
referred to, the several words characterizing a particular homi-
cide being used in substantially the same sense, may be read
disjunctively.   (Smith's Com. on Statutes, 732.)   The sub-
stance and effect of the statute is to be regarded and not every
unimportant matter of form or circumstance.   *Quæ hæret in
litera hæret in cortice.*

(2.) In the course of the charge to the jury the Court said:
"If several persons conspire together to seize with force and
by robbery, treasure or property belonging to another, and
escape with it, and if necessary, to kill any person who shall
oppose them in the execution of the design, and death ensue
in the prosecution of the design, it is murder in all who are
present aiding and abetting in the common design.   The law
makes no difference or distinction between any of the parties
engaged.   All engaged in such an *outrage* are aware that their
acts are unlawful, and that murder may result from such resis-
tance, and all alike must suffer the consequences."

It is objected on behalf of the defendant that characterizing
the commission of the acts stated by the Court in the form of
a postulate an *outrage* was calculated to prejudice the cause

of the defendant; but it is difficult to see wherein, for certainly to denominate the crime of robbery an outrage is a mild designation, which in no sense could do the defendant an injury.

(3.) After the Court had charged the jury respecting the law of homicide generally, and after having especially distinguished between the different degrees of crime in cases of criminal homicide, the Court instructed the jury as follows: " Gentlemen of the jury: Under this indictment you have the *power* to find the defendant guilty of murder in the first degree, murder of the second degree, or manslaughter, or not guilty."

The defendant's counsel objects to the word *power* as used in the portion of the charge here quoted; and it is argued that the instruction that the jury had the power to find as stated, implied that they might, or that it was their province, to render a verdict of guilty of either of the offenses specified, regardless of evidence. If such be not the force of the objection then it is without meaning and senseless. The charge would have been the same in effect if the Court had told the jury it was their province to find the defendant guilty of any one of the offenses specified, or not guilty.

(4.) The portion of the charge following the passage last quoted, in these words: " The law, however, makes all murder committed in the perpetration or attempt to perpetrate robbery, murder of the first degree," is also objected to as amounting to an instruction that the killing of Staples was a murder committed in the perpetration or attempt to perpetrate a robbery, and was for that reason murder of the first degree.

This objection, in our judgment, is not well taken, for the reason that the words are not fairly susceptible of the construction given them on the part of the defendant. The language of the Court here used must be understood as it stands related to other portions of the charge, and it is to be presumed the jury understood it as thus related.

III. The defendant requested the Court to instruct the jury in the following words: "If the jury believe from the evi-

dence in the case that the deceased, Staples, presented himself
at the door of the room occupied by defendant Pool and his
confederates, and presented a gun at them and demanded that
they surrender to him, but did not inform them of his official
position or authority to arrest them, or the cause of their
arrest, and at the time the gun was pointed at them they had
offered no violence to him, and they were ignorant of his
official character, and that the killing took place immediately
after the gun was presented at them first and while it was
levelled upon them, then the killing was no murder." The
Court refused to so instruct the jury, and the defendant
excepted.

The questions of law involved in the language of the re-
quested instruction have been quite fully considered already.
To have charged that the killing was no murder, provided the
facts were as hypothetically stated, would have ignored the
existence of other facts and conditions (concerning which there
was evidence before the jury), which, in some degree at least,
were of the elementary conditions giving character to the acts
and intentions of the defendant and his confederates, and upon
which, to some extent, depended the criminal quality of the
acts which were the immediate cause of the homicide. The
requested instruction proceeds upon the hypothesis that the
facts stated were the only material facts affecting the question
of murder in the case, and because of this, if for no other
reason, the request was properly refused. There was testi-
mony in the case of other material matters, which, if true, and
taken into consideration by the jury, might very properly
have had their influence in determining the jury as to their
conclusions respecting the character of the homicide, and
whether the defendant was guilty of murder or otherwise, or
not guilty of any crime at all.

We have carefully considered every point on which the
defendant has relied for a reversal of the judgment, with a
solemn sense of our duty in a case on the determination of
which the life of a fellow creature depends, and the conclu-

sion to which we have come is that the judgment should be affirmed.

The judgment is therefore affirmed, and the District Court is directed to appoint a day for carrying the judgment, pronounced in that Court, and now affirmed, into execution.

Mr. Chief Justice SANDERSON expressed no opinion.

By the Court, SAWYER, J., on petition for rehearing.

In the petition for rehearing, the counsel for appellant strenuously argues, that the substitution of the word " or," in the place of " and," in the phrase "wilful, deliberate and premeditated killing," constituting a part of the statutory definition of murder in the first degree, is a fatal error. He insists that the three words, "wilful, deliberate and premeditated" are not synonymous in meaning, and that the definition of murder in the first degree submitted to the jury was essentially, and materially different from that contained in the statute. It needs no argument to show that these several words, abstractly, and separately considered, are not synonymous. But we are not to consider them separately, or abstractly. They are to be considered in connection with the context. In discussing the question, a murder must be assumed to have been proved, and this fact must be considered as one of the conditions of the problem. For, unless there is a murder, no question can arise as to the degree of the murder, and the instruction bears upon the question of the degree only. The offense being murder the question is, not what does the word " wilful," or " deliberate," or " premeditated," mean, but what do the words " wilful killing," " deliberate killing," " premeditated killing," standing in relation to the offense of murder, signify? Can there be a " wilful killing," a " deliberate killing," or a " premeditated killing," without such killing embracing essentially the legal idea expressed by each of the other phrases? To determine this question it will be necessary to ascertain the legal signification

of these several phrases, and upon an examination and analysis of the authorities upon the question as to the degree of murder, the result, we apprehend, will be found to be, that there is a " wilful killing," within the meaning of the statute, wherever there is simply a specific intent, a design or purpose formed to take life ; that there is a "deliberate killing," wherever such intent or purpose is formed upon deliberation, or consideration, and the deliberation or consideration need not be for any particular period of time ; a moment is as effectual as an hour or a day ; and there is a " premeditated killing " wherever the deliberation or consideration precedes the purpose formed, and—as before stated with respect to deliberation—it need not precede the purpose formed for any particular period of time. In a late case in Tennessee (as quoted in 1 Whar. Crim. Law, Sec. 1,114,) the Court say : "It is true the Act says the killing must be wilful, deliberate and premeditated. But every intentional act is of course a wilful one, and deliberation and premeditation simply mean that the act was done with reflection and conceived beforehand. No specific length of time is required for such deliberation." Compare these well established legal definitions of the several phrases in question, and see if each does not necessarily imply all of the others? As to the phrase, " wilful killing," there seems to be no room for doubt. How is it possible for the mind to perform the operation of willing—of determining to do an act—of forming a purpose, without a preconsideration of the question? If A. determines to go to San Francisco, he must necessarily have thought upon the subject, considered the question, before he determined to go. And there would seem to be as little doubt, as to the other two phrases. A man may deliberate or meditate upon the subject of killing, and stop short of willing, or forming a purpose to kill. If he does stop upon the deliberation or meditation, without forming a purpose, he certainly will not kill, at least under such circumstances as will constitute the crime of murder. It seems as impossible to perpetrate a " deliberate *killing*," or a " premeditated *killing*," without first willing or forming the purpose to

74

do the act, as to form the purpose without a preconsideration. If there is any appreciable, substantial, material element affecting the degree of the offense expressed, or implied, by one of these phrases, that is not necessarily implied by each of the others, we are unable to discover it; and this seems to be the opinion of Mr. Wharton, the author of a very learned and carefully prepared work on American Criminal Law. He says: "In Pennsylvania, New Jersey, Virginia, Alabama, and Michigan the killing, to constitute murder in the first degree, must be 'wilful, deliberate and premeditated.' The omission of 'wilful' in New Hampshire, and the addition of 'malicious' in Tennessee, cannot, it is apprehended, vary the construction given to the statutes." (Am. Crim. Law, 5th ed., Sec. 1,084,) If the omission of "wilful" cannot vary the construction, it must be because a deliberate or premeditated killing necessarily implies a wilful killing, and if the word "wilful"—the most comprehensive term, if there is any difference—can be omitted without varying the construction, certainly, either of the others can be dispensed with. Such being the case it is not material whether the word "or," or "and," be used. The word "malicious" evidently could not vary the construction, for the killing must be malicious to constitute murder in either degree. We may add, that the passage quoted may be regarded as expressing the matured opinion of the author, for it is also found in the earlier editions of his work on Criminal Law. Thus, after this work has been for several years before the public and subjected to the criticisms of Courts and the legal profession, it is still retained in the fifth and last edition. The language in the statutes of Virginia is the same as in our own. Yet, in *Jones' Case*, 1 Leigh, 654, Mr. Justice Daniel, who delivered the opinion of the Court, in his frequent repetitions of the clause in question, uses the words, "or," and "and," indiscriminately. The exact point was not under consideration as to the effect of the use of these different words, and of course the case is not authority upon the point now before us. But it shows, at least, that it did not occur to the learned Judge at the time, that the two phrases did not sub-

stantially express the same legal idea. Mr. Chief Justice Hornblower—as quoted in Wharton's Law of Homicide, 382 —commenting upon the statutory provision in New Jersey— which is the same as ours—says : " Again, the premeditation or intent to kill need not be for a day, or an hour, or even for a minute. For if the jury believe there was a design, a determination to kill, distinctly formed in the mind at any moment before, or at the time the pistol was fired or the blow was struck, it was a wilful, deliberate and premeditated killing, and therefore murder in the first degree." Now, here it is said, substantially, that "a design, a determination to kill, distinctly formed in the mind," followed by the act of killing, embraces all the elements required by the statute to constitute murder in the first degree. It is scarcely within the range of possibility that the inadvertent use of the word "or," instead of "and," in the charge of the Court—whether upon a critical analysis it shall be found to express precisely the same idea or not—could have had the slightest influence upon the verdict.

Upon the case disclosed by the record, there cannot be a shadow of doubt that the prisoner was in fact guilty of murder in the first degree. Nevertheless, if it had appeared that any error had been committed, which rendered it even in a remote degree probable, that the verdict could have been in any way affected by it unfavorably to the defendant, we should feel it our duty to reverse the judgment. We cannot perceive that there is any substantial material difference in the legal construction to be given to the phrase contained in the charge, and that embraced in the statute, or that any injury could have resulted to defendant. We see no other point in the petition that requires further discussion.

Rehearing denied.

Mr. Chief Justice SANDERSON expressed no opinion.