## Peace v. Commonwealth.

(Decided February 14, 1912.)

## Appeal from Whitley Circuit Court.

1. Homicide—Voluntary Manslaughter—Bias of Juror—New Trial. —Where a new trial is sought on the ground of personal bias of a juror, affidavits showing statements indicating bias will not be considered when neither they nor the affidavit of the defendant show that he did not know of such bias before the juror was accepted.

2. Same—Voluntary Manslaughter—Erroneous Instruction—Prejudicial Error.—The omission of the words, "or in sudden affray" from an instruction on voluntary manslaughter, is not prejudicial error, where the defendant, though indicted for murder, was con-

victed of voluntary manslaughter, for he may not complain of the fact that the jury might have returned the same verdict on some other ground, which the court failed in its instructions to present to the jury.

TYE & SILER for appellant.

JAMES GARNETT, Attorney General and JAMES D. BLACK, Assistant Attorney General for Commonwealth.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY—COMMISSIONER—Affirming.

Appellant, B. C. Peace, was indicted for murder. The jury found him guilty of voluntary manslaughter, and he was given an indeterminate sentence of from two to twenty-one years in the penitentiary. From the judgment of conviction he appeals.

The homicide took place on July 22, 1910, about 9 o'clock p. m., at the residence of Scott Moore, who lived on Poplar Creek, in Whitley County, about a quarter of a mile from the county road. Abe Harris, the man who was killed, was a son of Scott Moore's wife, Sarah Moore, by a former husband. Early in the evening, there were present at Scott Moore's house Scott Moore, Sarah Moore, the deceased, Abe Harris, Lulu Moore, Rebecca Harris, Will Baker, Katie Baker and Will Swain. Later on they were joined by Sim Swain and Ellen Swain, the brother and wife of Will Swain, who had gone to the Moore house in search of Will, who it seemed was intoxicated. About 8 o'clock, Owen Peace, L. L. Peace and George Bennett arrived. During the day, Squire Siler, a justice of the peace, had been holding court in that vicinity, and a large number of those who were at Scott Moore's, had been in attendance. Just before the shooting took place, the three Swains and Katie and Will Baker had gone outside the house. While they testify to the firing of the shot by appellant, they knew but little of what took place in the house just previous to the trouble. Rebecca Harris was in the kitchen, and knew none of the particulars of the tragedy. The principal witnesses for the Commonwealth are Sarah Moore and Scott Moore, and Lulu Moore and James Kernutt. According to their testimony, they heard appellant and his brother, Cal Peace, approaching. The latter were making a noise. Scott Moore called to them and told them to go back, that they were drinking and that he didn't want to be deviled with

drunken men. Scott Moore got his shotgun, and some one told him where the cartridges were, but he then laid the gun down. He did not swear any or threaten to shoot the men who were approaching. When appellant and his brother got within a few feet of the door, James Kernutt and Lulu Moore were standing at the door. Owen Peace and one or two others passed out the door. As Owen went out, appellant threw his gun on Owen, who said, "What do you mean?" Appellant said, "Is that you, Owen?" Just then, the deceased came to the door with the shotgun under his arm pointing upward. According to Sarah Moore's testimony, appellant took hold of deceased right shoulder with his left hand, and pulling him forward, shot him in the neck, the bullet coming out under his right shoulder blade. She also claims that appellant took the gun away from her son with his left hand before he shot him. Lulu Moore says that some one took hold of the gun just before the shot was fired. According to James Kernutt, appellant grabbed the gun with one hand and shot with the other.

Deceased was a hunchback and weighed about one hundred and thirty pounds. He could not dig coal, but could load coal and had been employed in that kind of work. He hunted some and knew how to handle a gun. The Moores admitted that they had a very vicious dog, but denied that appellant or his brother had asked them to mind the dog, or that any one undertook to hold the dog.

Appellant testified that he was a coal miner, and was engaged in mining coal at Halsey, a place about five miles distant. He had a law suit that day in Squire Siler's court, and had gone there for the purpose of attending court. Saw deceased there. He and deceased had gone to school together, and had always been friends. That evening, he started for his father's home, but stopped at the home of his brother, Cal Peace, to get some picks. His brother told him he had loaned the picks to Scott Moore, who had not returned them, and they started to Scott Moore's to get the picks. As they approached the house, they remembered the dog, and Cal said, "Hello! Scott; it is Cal and Sil (the name ordinarily applied to appellant) Scott said, "Come on to the house, Cal; the dogs shall not bother you." When they got within eight feet of the door, they heard a voice, that sounded like Scott's, saying, "Get out of here—I will kill every one of you sons of bitches." Just then Owen

Peace came out the door and made a motion with his hand. Didn't recognize Owen because his face was away from the light. Thought Owen was throwing a gun on him. He then threw his gun on Owen. Owen said, "Don't shoot me." Witness said, "Don't let them kill me." As he turned his head back to the door, the shotgun was at his breast, and some one said, "I will shoot every damn one of you." He then fired his pistol and caught hold of the barrel of the gun. L. L. Peace said, "Let the shotgun down." The shotgun was cocked and loaded. He fired as soon as he saw the shotgun at his breast. As he approached the house, he had his pistol in his hand. The pistol belonged to Everett Peace, and witness was going to leave it at his father's for Everett. Appellant's testimony is corroborated by that of his brother, Cal Peace, and Owen Peace. L. L. Peace and George Bennett testify to substantially the same facts.

The court gave to the jury the following instructions:

"If you believe from the evidence beyond a reasonable doubt, that the defendant, B. C. Peace, in this county and before the finding of the indictment herein, wilfully and unlawfully shot with a gun or pistol loaded with powder and leaden balls, and other explosive or hard substance, and killed the deceased, Abe Harris, then you should find the defendant, B. C. Peace, guilty:

"Guilty of willful murder, if you believe from the evidence beyond a reasonable doubt, that such shooting and killing was done with malice aforethought.

"Guilty of the lower offense of voluntary manslaughter, if you believe from the evidence, beyond a reasonable doubt, that said shooting was done in sudden heat and passion and without malice.

2.

"If you find the defendant guilty of willful murder, you will fix his punishment at death, or confinement in the State penitentiary for life.

"If you find the defendant guilty of voluntary manslaughter, you will do so and no more.

3.

"Although you may believe from the evidence beyond a reasonable doubt, that the defendant, B. C. Peace, in this county and before the finding of the indictment, shot at and killed the deceased with guns and pistols loaded with powder, leaden balls and other ex-

plosives or hard substances, at the time and place mentioned in the indictment, yet if you shall further believe from the evidence that at the time the defendant fired the shot that took the life of the deceased, Abe Harris, if you shall believe from the evidence beyond a reasonable doubt that he did so do, he believed, and had reasonable grounds to believe, he was then and there in danger of death or the infliction of some great bodily harm at the hands of the deceased, or some one then and there acting in concert with the deceased, and that it was necessary, or was believed by the defendant in the exercise of a reasonable judgment to be necessary, to so shoot and kill the deceased in order to avert said danger, real or to the defendant apparent, then you should acquit the defendant on the grounds of self-defense and apparent necessity therefor.

4.

"If you have a reasonable doubt of the defendant having been proven guilty, then you should find him not guilty:

"Or, if you shall believe, beyond a reasonable doubt, that the defendant has been proven guilty, but have a doubt as whether his crime is willful murder or the lower offense of voluntary manslaughter, then you should find him guilty of the lower offense.

"The words, 'willful' and 'willfully,' as used in these instructions, mean intentional and not accidental.

"The words, 'voluntary manslaughter,' as used in these instructions, mean the unlawfully, willfully killing of a human being in sudden heat of passion and without previous malice.

"The words 'malice aforethought,' as used in these instructions, mean a predetermination to do the act of killing without legal excuse, however suddenly or recently formed before the killing."

Among the grounds relied upon for a new trial was the bias and prejudice of one of the jurors, M. J. Hoffman, of which appellant did not know when the jury was impaneled to try the case. This ground is supported by the affidavits of P. C. Irvin and Sarah Irvin, who say that they heard M. J. Hoffman "state that he had had a talk with parties who were eye-witnesses to the killing of Abe Harris; that the said B. C. Peace deserved a death sentence for said killing; that same was done without any cause for so doing; that if he could be on the

jury who gave him a final trial, he would be in favor of placing him in the electric chair; that he was a murdersome, cruel-hearted man; that he had no use for any of the Peaces." No counter affidavits were filed. While in the grounds for a new trial prepared by counsel it is stated that appellant did not know of the bias of the juror when the jury was impaneled, this statement is not supported by any of the affidavits filed. The Irvins do not state that they did not communicate to appellant before the juror was accepted the statements he had made, nor does appellant's own affidavit state that he was not aware of the juror's statements before he became a juror. Without such a showing, affidavits in regard to the statements of a juror showing bias will not be considered. Were the rule otherwise, the defendant could take chances on a favorable verdict, and yet insist on a new trial in case of an unfavorable verdict. This will not be permitted. It follows that the trial court properly overruled the motion for a new trial.

The instructions are not subject to the objection pointed out in the case of Martin v. Commonwealth, 25 Ky., Law Rep., 1928. In that case it is pointed out that the danger to one's life or of great bodily harm to his person that authorizes one to act in his defense, may be real or apparent. This phase of the case is thoroughly covered by instruction 3 in the following language: "Or was believed by the defendant in the exercise of a reasonable judgment to be necessary to so shoot and kill the deceased in order to avert said danger, real or to the defendant apparent, then you should acquit the defendant, etc."

The instruction on voluntary manslaughter is defective in omitting the words, "or in sudden affray." Had appellant been convicted of murder, this might have been cause for complaint, for he would then have been deprived of a chance for a manslaughter verdict on one other ground; but having been convicted of voluntary manslaughter, he may not complain of the fact that the jury might have returned the same verdict on some other ground which the court neglected to present in its instructions.

Not being able to say that the verdict is flagrantly against the evidence, or that there is any error in the record prejudicial to the substantial rights of appellant, it follows that the judgment should be affirmed, and it is ordered.