## Cottrell v. Commonwealth.

(Decided Dec. 10, 1937.)

GILBERT & DAVIS for appellant.

HUBERT MEREDITH, Attorney General, and W. OWEN KELLER, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE PERRY—Affirming.

The appellant, John Will Cottrell, has appealed from a judgment of the Spencer circuit court, sentencing him to confinement in the state penitentiary for 21 years as the result of his conviction of voluntary manslaughter at the March, 1937, term of that court.

The material facts in this case, as disclosed by the record, appear to be very clearly established by the testimony given by the accused in his own behalf and are, for the most part, uncontradicted.

These facts involved upon this appeal are, briefly summarized and for the most part as stated in counsel's brief for appellant, as follows:

The appellant, John William Cottrell, on November 23, 1936, received an anonymous note, advising him that his wife was too intimate with one Cox. The Cox referred to in the note was the decedent, Delbert Cox, who lived near the accused, Cottrell, in the Waterford

community of Spencer county. The accused and the deceased were friends and cropper tenants upon neighboring farms, and they and their families had for years enjoyed a relationship of close and friendly intimacy.

The appellant testifies that he had for some while previous to the receipt of the anonymous note been somewhat disturbed by observing a seeming aloofness on the part of his wife and her lack of interest in him and their children, and that upon receipt of this note, advising him to "wake—see what is going on" as to his wife's running after Cox, he began to investigate the matter of their illicit relationship; that he made inquiry of numerous ones who had been intimate associates of his wife, who advised him, he testifies, that there was considerable talk throughout the neighborhood about his wife's intimacy with and running after Cox, that, in fact, the matter had become common gossip. He testifies that he went to the home of the deceased to talk with him about this general rumor concerning an improper intimacy between him and his wife and was told by Cox that, "it is just a pack of damn lies got started, nothing at all, I met your wife up on the road but not through any harm"; that he told him, "Delbert, the whole county is talking about it, you must straighten that up," but that he "just kept saying it was a passel of lies."

Cottrell testifies that he brooded over this matter for a whole week after receiving this letter and that it so harrassed him that his state of mind was such that he could not eat or sleep and that he became so depressed over the matter that finally, on Monday, November 30, when he came into the house and sat down at the dinner table, "I couldn't eat at all, I commenced crying and my wife come to me and told me, 'you think I have been lying to you about this, don't you?' I told her I did. She broke down and went to crying and told me that on Labor Day, early in September, the day she went to Louisville after the groceries for silo hands, she met Cox on the street in Louisville and said he come up to her and was drunk." Further, when asked to "tell all she said to you," he testified as follows:

"Said she went to the room with him on that day. He just took her by the arm and led her on to the room and she told me that he had given her the medicine that caused the miscarriage, she taken that, and she said he had asked her several differ-

ent times to leave and run off with him and leave me and go with him and she wouldn't do it."

When asked what effect that confession had on him, he replied, "Well, I went crazy, I reckon, I don't know what," and in reply to the question, "Are you subject to any kind of spells?" he answered, "Nervous spells and sleepy spells, get nervous and sleepy, just fall over to sleep at work or anything." He further testified that he had been having these spells for about 10 years; that he had had an infection of the brain or a tumor on it; and that Dr. Spurling of Louisville had operated on him for it.

He testified further, in regard to the effect of his wife's confession upon him when in that mental condition, as follows:

"Well, I thought of everything that had happened, the whole story got on my mind, the way everything had been going on and I knew that I would have to do something to stop it. I couldn't stand it any longer";

also he stated that his landlord, Mr. Walker, had told him that he had talked to Cox a time or two about his affair with Cottrell's wife and tried to get him to stop but that he had laughed at him and made fun of him.

Cottrell's further testimony reveals that he was so upset and crazed by these reports, verified by the confession of his wife, that at once "I went into the other room and got my gun and went to Waterford to the store and bought me some shells and went on down to Mr. Cox's"; that on his way to Mr. Cox' home he stopped by Mr. Cumley's, his friend, the blacksmith, and asked if Delbert Cox was there; that he told him he wasn't there and said, "Wait, I want to speak to you a minute"; that they went on the outside of the shop, when Mr. Cumley told him, "Don't you go down there, you are going to get into trouble." "I told him I was already in trouble and I went on down there. He said, 'don't go and kill him.' I said, 'I don't want to kill him, I want to cripple him or do something to stop him running after my wife' "; that he went on to Cox' home and inquired for him, when he was told by Cox' wife that he was not at home, but at Mort Hatfield's, on the adjoining farm, killing hogs; that on learning this

"I went on around behind the house and on down the fence and got over the fence in the road and

started down there and I began to get sleepy and drowsy and couldn't see hardly, and I got over the fence, the fence was low, over in Mr. George Day's bottom, and I walked on down the fence from there, thought I would get out on the road. I went on down there until I met Delbert. He was right close to me before I saw him. I raised my gun and went to shooting at him. I just went all to pieces and went to shooting."

"Q. Did you curse him? A. I don't think I did. I don't know what I said.

"Q. Do you know what he did? A. No, sir, I just know I went to shooting. That is all.

"Q. Did you lay in wait for Cox? A. No, sir, I don't think so. If I did, didn't know it.

"Q. If you did, were you at yourself? A. No, sir. I didn't wait for him no place.

"Q. At the time you shot him, state to the jury what your mind was? A. Well, I didn't have any mind. I didn't know what I was doing, nor nothing else.

"Q. Did you know right from wrong? A. No sir.

"Q Were you able to control your actions? A. No, sir."

The circumstances surrounding the accused's shooting of the deceased upon this occasion were shown by the evidence to be that after looking for Cox at his home that he then went down the field beside the rock fence along the road to a thicket of trees, bushes, and weeds at the corner of the field next the road, where he laid in wait for Cox as he returned by the road to his home; that, as Cox was later passing this place, he shot him three times in his legs as he attempted to run away, severing arteries in his legs, from which wounds, according to the evidence, he soon bled to death.

Upon submission of the case to the jury upon this evidence, the court gave the jury the murder instruction and also an instruction upon manslaughter, directing that, "If, however, the jury believe from the evidence beyond a reasonable doubt, that the defendant * * did * * willfully and feloniously, in sudden affray or sudden heat and passion, without previous malice, and not in his necessary self-defense, shoot at and wound Delbert

Cox with a shot gun * * from which shooting and wounding the said Delbert Cox * * died, the jury should find the defendant guilty of 'voluntary manslaughter,' * * *'' and also gave further instructions applicable to the evidence in the case, not here involved or attacked.

A verdict was returned finding the defendant guilty of the offense of voluntary manslaughter and fixing his punishment at 21 years' confinement in the penitentiary, upon which judgment and sentence was accordingly pronounced.

Appellant has appealed, insisting chiefly upon three grounds for reversal of the judgment: (1) That the court erred in submitting a manslaughter instruction; (2) that it erred in failing to give a self-defense instruction; and (3) that the appellant did not receive a fair trial because of the prejudice of a juror.

We will now discuss and dispose of these objections in the order presented.

The first of these objections is that the court erred in submitting to the jury upon this evidence a manslaughter instruction.

The common-law offense of manslaughter has been subdivided by carving out of it the crime of voluntary manslaughter, leaving involuntary manslaughter to be dealt with as at common law. Spriggs v. Commonwealth, 113 Ky. 724, 68 S. W. 1087, 24 Ky. Law Rep. 540. Further, in Bowlin v. Commonwealth, 94 Ky. 391, 22 S. W. 543, 15 Ky. Law Rep. 149, we held that upon a trial for murder, if there is any evidence tending to show the homicide is of the degree of manslaughter, the accused is entitled to an instruction upon that hypothesis, as it is not the province of the court to weigh evidence for the purpose of determining whether the defendant is entitled to such an instruction. It is the duty of a trial court in a criminal case to instruct upon the whole law of the case, whether so requested or not, or, as this has been stated by us, "it is a well-settled rule that instructions applicable to every state of case deducible from the testimony, or supported by it to any extent, should be given." Tucker v. Commonwealth, 145 Ky. 84, 140 S. W. 73, 74. Further, where the evidence is entirely circumstantial, the court should give the whole law applicable to any state of case that might have existed, but, where there is evidence (as here there is, the appellant, an eye-witness having testified) as to

what occurred at the time of the killing, the court should instruct as to the law, based upon the facts developed in evidence. McDowell v. Commonwealth, 4 Ky. Law Rep. 353; Joy v. Commonwealth, 203 Ky. 426, 262 S. W. 585; Vaughn v. Commonwealth, 204 Ky. 229, 263 S. W. 752; Frasure v. Commonwealth, 169 Ky. 620, 185 S. W. 146.

Voluntary manslaughter is defined at common law, and under the statutes declaratory thereof, as the killing of another intentionally, without previous malice, but in sudden heat of passion, due to adequate provocation. Curtis v. Commonwealth, 169 Ky. 727, 184 S. W. 1105; Heck v. Commonwealth, 163 Ky. 518, 174 S. W. 19; Peace v. Commonwealth, 146 Ky. 754, 143 S. W. 399; Greer v. Commonwealth, 111 Ky. 93, 63 S. W. 443, 23 Ky. Law Rep. 489. To constitute voluntary manslaughter, the killing must be ''done either in sudden affray or in sudden heat of passion, and upon provocation ordinarily calculated to excite the passion beyond control.'' 29 C. J. 1125; Cavanaugh v. Commonwealth, 172 Ky. 799, 804, 190 S. W. 123; Combs v. Commonwealth, 112 S. W. 658, 33 Ky. Law Rep. 1058; Burton v. Commonwealth, 119 Ky. 664, 60 S. W. 526, 22 Ky. Law Rep. 1315.

It is earnestly insisted by counsel for appellant, in support of the contention that the giving of the manslaughter instruction was here erroneous, that nothing appears in the evidence as above recited which justifies any instruction except upon willful murder and that, in such case, it is well settled that it constitutes prejudicial error for the court to instruct the jury as to voluntary manslaughter; that, where the evidence points to murder or acquittal, and there is no middle ground (which he insists is here the situation), then the court commits grievous error by instructing the jury on voluntary manslaughter and that it is no argument against such principle to answer that the defendant is not prejudiced because the punishment for manslaughter is less than that for murder. Counsel for appellant earnestly insists that this very fact constitutes one on which this principle is founded, which is that the law recognizes the human tendency of juries to mete a less severe punishment than that fixed for murder, even when the evidence in the case warrants only a conviction of murder or acquittal.

In support of such argument, appellant invites the court's attention and consideration to the case of John-

ston v. Commonwealth, 170 Ky. 766, 186 S. W. 655, 657, upon which he relies, wherein the court said, in discussing the propriety of the manslaughter and self-defense instructions given, that:

"As will be seen, there was no evidence either of manslaughter or self-defense. * * * It is conceded by the attorney for the commonwealth that appellant was entitled to an instruction upon every phase of the evidence * * * but no more. It, therefore, results that the giving of the manslaughter instruction, to which appellant objected, was erroneous, and that the jury found the appellant guilty under an erroneous instruction of a crime that was not proven by the testimony is conclusive that the giving of the instruction was prejudicial.

"It can well be argued, and is convincing, that upon the confessedly meager testimony against appellant in this case, the jury would have been unwilling to have convicted him of murder, the only crime proven, and that it was prejudicial to his rights to authorize the jury to convict him of a lesser crime that was not proven."

However, the facts of the Johnston Case are different and easily distinguishable from those of the instant case, as it may be observed upon an examination of the evidence in that case.

It is shown by the evidence in this case that the appellant met Cox as he was coming up the road from Hatfield's place to his home and that the deceased had come right close to him before he saw him, when he "raised his gun and went to shooting at him"; that he "just went all to pieces and went to shooting"; that he did not "lay in wait" for Cox or wait for him in the thicket; that when he saw him, he "didn't know what he was doing or nothing else"; that, when he suddenly looked and saw him, he was not able to control his actions, nor did he know what he was doing, but that he only knew he "went to shooting—that is all," and continued to shoot at him as he attempted to run away.

It is true some time had elapsed between his wife's confession, made him when confronted with her reported unfaithfulness to him, and the later meeting and shooting of the deceased, but it is shown that from the time of receiving the confession until his later shooting of the deceased he was acting under the one constant

goad of his sense of wrong and provocation given by deceased in despoiling his home.

In the comparatively recent case of Vaughn v. Commonwealth, 204 Ky. 229, 263 S. W. 752, 754, the facts are very similar with those found in the instant case.

There the appellant, Vaughn, shot and killed one Rider in a church, because of Rider's suspected intimacy with his wife. Vaughn, upon entering the church, took a seat in the rear, where he watched Rider for about ten minutes, then arose and walked over and fired five or six shots into his body. Vaughn's testimony as to his conduct is as follows:

"Well, when I walked in and sat down, as soon as I came in, Mr. Rider threw his eyes right on me, and he just sat there and watched me, looked under the corner of his eyes like this (indicating) and had his hands throwed down in his lap,"

and it was then, so he claims, that he was overcome by an attack of acute mania superinduced by the long period of mental and physical anguish he had undergone as the result of the debauching of his wife and the wrecking of his home and happiness by the man who sat and stared steadily at him; that he did not know just what he did do.

Upon this state of facts, the court instructed the jury on the law of murder and the defense of insanity, but refused defendant's request for an instruction on voluntary manslaughter.

In discussing the propriety of the refusal to give this instruction, we there said:

"It is a well settled rule of law that instructions applicable to every state of case deducible from the testimony or supported by it to any extent should be given. Greer v. Commonwealth, 111 Ky. 93, 63 S. W. 443, 23 Ky. Law Rep. 489; Tucker v. Commonwealth, 145 Ky. 84, 140 S. W. 73. The rule is thus stated in Bowlin v. Commonwealth, 94 Ky. 391, 22 S. W. 543, 15 Ky. Law Rep. 149:

" 'In fact it is not the province of the lower court, any more than of this, to weigh evidence for the purpose of determining whether a person on trial for his life is entitled to an instruction as to manslaughter. But, if there is any evidence tending to show the homicide is of the degree of man-

slaughter, the accused is entitled to an instruction upon that hypothesis.'

"After a most careful consideration of the record in this case, we feel constrained to hold that the court erred in refusing to instruct the jury upon the subject of manslaughter. * * *

"Appellant's evidence, whether credible or not, strongly refuted the inference of malice, and tended to show that appellant committed the homicide under emotions suddenly aroused beyond control by the memory of his alleged wrongs, the presence and the conduct of the wrongdoer, and the surrounding circumstances, and without any malice or premeditation on his part. Whether he acted under such emotions so aroused, and whether they were the result of insanity or of sudden heat and passion under sufficient provocation, were questions solely for the jury to weigh and determine, and that issue should have been submitted under proper instructions."

Upon such ground of error in the court's failing to give the manslaughter instruction, the judgment of conviction was reversed. See, also, the later case of Cook v. Commonwealth, 262 Ky. 718, 91 S. W. (2d) 25.

Approving the reasoning and principle of the decision in the Vaughn Case, we are, upon the very similar facts of this case, of the opinion that the giving of the manslaughter instruction complained of was here proper. In fact, such ruling we deem was in recognition and conformity with a principle common to most systems of jurisprudence, arising from essential conditions of life, that the punishment for unjustifiable, intentional killing should be less severe when the fatal blow is impelled by a transient rage, reasonably induced by and immediately following a wrongful act done by the person killed to the slayer. Such wrongful act may constitute legal provocation under our law, reducing in proper instance murder to manslaughter. But it should be remembered that, if it have such effect of calling for the milder punishment, the killing must be in fact the result of a sudden rage, difficult for the ordinary man to control and directly induced by a grievous injury. However, if the killing is shown by the evidence to have been committed in a spirit of revenge, demanding life for a wrong, the offense, despite the provocation therefor, remains one of murder.

Turning our attention to appellant's next objection, which is, that the court erred in failing to give a self-defense instruction, we will again look to the evidence purporting to show the facts and circumstances under which the appellant shot the deceased. There is none whatever indicating that he considered his life in danger or that any harm was threatened or about to befall him at the hands of the deceased as he was approaching, when it appears he neither had spoken to or seen the appellant, nor is there any testimony whatever to the effect that he attempted to defend himself. On the other hand, appellant states that:

"He was right close to me before I shot him. I raised my gun and went to shooting at him. I just went all to pieces and went to shooting."

"Q. Do you know what he (deceased) did? A. No, sir, I just know I went to shooting, that is all." Again he states:

"I never noticed whether he saw me or not. As soon as I saw him, I commenced shooting at him. * * * When I went to shooting, he commenced trying to get out of the way and ran first one way and then another."

It is not enough, because a man has despoiled another's home, for the latter to assume that the despoiler is always aggressive, so that he may be shot down in self-defense, where shown by the evidence he was doing nothing at the time he was shot and killed and without any overt act or threat made against the injured aggressor.

The right of self-defense should not be carried to such an extreme, where the reason for the right ceases to exist. The right of self-defense is one founded on the law of nature, and is not superseded by the laws of society. Isaacs v. State, 25 Tex. 174; U. S. v. Outerbridge, Fed. Cas. No. 15,978, 5 Sawy. 620; Long v. State, 52 Miss. 23; Gray v. Combs, 7 J. J. Marsh. 478, 23 Am. Dec. 431; U. S. v. Holmes, 1 Wall. Jr. 1, Fed. Cas. No. 15,383.

It is a right based on necessity. People v. Pool, 27 Cal. 572, which every one brings into society, and retains in society, except so far as the laws of society have curtailed it, Gray v. Combs, 7 J. J. Marsh. 478, 23 Am. Dec. 431.

An act done from necessity raises no presumption of a criminal intent, but the necessity must be actual, imminent, and apparent, with no other probable or possible means of escape. It must be great, and must arise from imminent peril to life or limb. Kennedy v. Commonwealth, 14 Bush 340, 341; People v. Sullivan, 7 N. Y. 396.

Men, when threatened with danger, must determine the necessity of resorting to self-defense, and they will not be held responsible for a mistake in the extent of the actual danger, nor be subject to the peril of making that guilty, if appearances prove false, which would be innocent if they proved true. Meredith v. Com., 18 B. Mon. 49.

Such being the nature and ground upon which rests the right of self-defense, we are clearly of the opinion that no such ground or justification was here given by the evidence, justifying the giving of a self-defense instruction.

The next and final objection urged for reversal is that a juror, W. E. Conlee, was prejudiced and had formed and expressed an opinion, prior to the trial of the case, as to the defendant's guilt.

Such objection is based on the affidavit of H. C. Parchman, a barber, following the rendition of the judgment, in which Parchman stated that he heard the juror Conlee say that he (Conlee) could not serve on a jury to try John Will Cottrell, but that, if he served on the jury, he would give him plenty of trouble. Parchman further states that other persons heard this statement, although he does not remember the names of any of them.

Conlee, however, denies making any such statement in Parchman's barbershop or any place concerning the defendant, Cottrell; further, that he did not know Cottrell before the trial and had never seen him, nor did he know the deceased, Cox. He denied having any bias or prejudice whatever in the matter.

Such being the case, we must needs find that this objection, here urged, is immaterial and does not warrant the view that any substantial rights of the appellant were prejudicially affected upon his trial through Conlee's serving upon the jury therein.

To such effect was the holding and ruling made upon a like objection urged for reversal in the case of

Miller v. Com., 203 Ky. 437, 262 S. W. 579, 580. There the court quoted with approval the following from Mansfield v. Com., 163 Ky. 488, 174 S. W. 16:

"The evidence that would justify the trial court in setting aside a verdict on the ground that one of the jurors had expressed opinions that would disqualify him from sitting in the case, if they had been known, should be very clear and convincing, when first brought to the attention of the court after the verdict. If new trials could readily be secured after the verdict on grounds like these, the temptation to procure the needed evidence and the ease with which it could be procured, would result in many new trials being granted on this ground when the verdict should not be disturbed."

Therefore, it is our conclusion that the defendant, having here had trial by an unobjectionable jury of his community, selected fairly for determining, under proper instructions, the fact of defendant's guilt, and they having found him guilty of the crime of manslaughter, we are not authorized to say that the evidence does not support their verdict.

After a careful consideration of the whole record, we find no error committed upon the trial prejudicial to the substantial rights of the accused. Wherefore, the judgment must be affirmed.