## Cavanaugh v. Commonwealth.

(Decided December 15, 1916.)

### Appeal from Hopkins Circuit Court.

1. Criminal Law—Review—Evidence—Sufficiency.—In a criminal prosecution, where the question of the guilt of the defendant depends upon whether the witnesses for the Commonwealth or those for the defendant are to be belived and the Court of Appeals is unable to say that the verdict is flagrantly against the evidence, it will not interfere with the verdict.

2. Homicide—Review—Prosecution for Murder—Evidence Held Sufficient.—In a prosecution for murder, evidence held sufficient to sustain the verdict of guilty.

3. Criminal Law—Trial—Instructions on Murder and Manslaughter—One Instruction May Contain Both.—In a prosecution for murder it is proper for the trial court, in its instructions to the jury, to give the law on the subject of both murder and manslaughter in one instruction.

4. Homicide—Voluntary Manslaughter—What Constitutes—Instructions.—In order to constitute a homicide voluntary manslaughter on the ground that it was done in sudden heat of passion, there must have been sudden heat of passion upon provocation ordinarily calculated to excite the passion beyond control, neither the sudden heat of passion nor the provocation being sufficient alone to constitute the killing voluntary manslaughter; hence an instruction upon voluntary manslaughter worded, "In sudden affray or in sudden heat of passion and upon provocation ordinarily calculated to excite the passion beyond control," was correct.

5. Homicide—Evidence as to Self Defense—Leading Question Not Permissible.—While in a prosecution for murder it is permissible for the defendant to state, if such be his defense, that the killing was in his apparently necessary self-defense, the question, "Did you shoot L. G. in your own necessary self defense, to protect yourself from great bodily harm or death at his hands, as you then believed?" was leading in form and properly excluded by the court.

6. Criminal Law—Trial—Evidence—Moral Character of Witness Subject to Attack.—Under section 597, Civil Code, applying also to criminal cases, the moral character of a witness for the Commonwealth is subject to attack.

7. Criminal Law—Review—Rejection of Evidence—When Not Ground for Reversal.—To authorize the reversal of a judgment of conviction for felony upon the ground of the rejection of evidence offered on behalf of the defendant, the evidence rejected must not only have been merely pertinent or relevant, or technically admissible, but also important for the defendant in view of the whole case as presented.

8. Criminal Law—Review—Character of Witness—When Court's Refusal to Permit Attack on Not Prejudicial Error.—Where several witnesses for the Commonwealth furnished abundant evidence as to the matters testified to by one of its witnesses whose character was sought to be impeached by the defendant, the trial court's refusal to permit the attack upon his character, while erroneous, was not such prejudicial error as to authorize the reversal of the case.

9. Criminal Law—Review—Reservation of Grounds—The Court of Appeals is without authority to consider a complaint of alleged improper statements made by the Commonwealth's attorney in argument to the jury in a criminal prosecution, where such misconduct was not embraced in the motion and grounds for a new trial.

10. Homicide—Review—Trial—Statement by Counsel in Argument to Jury.—In a prosecution for murder a statement by the Commonwealth's attorney in argument to the jury, explaining voluntary manslaughter, held to be a correct statement of the law and therefore not improper conduct.

11. Homicide—Trial—Evidence—Dying Declaration.—Where deceased expressed to several witnesses his belief that he would die in a

few hours and to none that he had a chance to recover, and he did die shortly afterwards, though his physician told him an immediate surgical operation might possibly save his life, statements made by him at the time were admissible as dying declarations.

12. Homicide—When Not Admissible.—Statements by the deceased that "he was shot without cause," and "he shot me just because he could," were mere expressions of opinion and not competent evidence as part of his dying declarations.

13. Criminal Law—Review—Evidence—When Failure to Exclude Parts of Dying Declarations Not Prejudicial Error.—The failure of the trial court to exclude the single statement "he shot me just because he could," was not prejudicial error, in view of the competency of numerous other statements contained in deceased's several dying declarations, and of the sufficiency of the evidence, other than such declarations, to authorize the verdict.

14. Criminal Law—Review—What Will Authorize Reversal.—In conformity to section 340, Criminal Code, the Court of Appeals will not reverse the judgment of conviction in a criminal case unless, upon consideration of the whole case, it is satisfied that the defendant has been so prejudiced in some substantial right as to have been deprived of a fair trial.

COX & GRAYOT for appellant.

M. M. LOGAN, Attorney General, and O. S. HOGAN, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE SETTLE—Affirming.

The appellant, B. Frank Cavanaugh, was tried and convicted in the court below under an indictment charging him with the crime of willful murder, committed by shooting and killing Leonard Griffin, March 30, 1916, his punishment being fixed by the verdict of the jury and judgment of the court at confinement in the penitentiary for life. He was refused a new trial by the circuit court and has appealed. Six grounds are urged in the brief of his counsel for the reversal of the judgment: (1) The evidence of the Commonwealth was not sufficient to sustain the verdict; (2) error in the instructions given by the court; (3) error of the court in refusing to allow appellant to testify that he shot deceased to protect himself from great bodily harm or death; (4) error of the court in refusing to allow the general moral character of Humphrey Hawkins, witness for the Commonwealth, to be impeached; (5) misconduct of the Commonwealth's attorney in argument to the jury; (6) error of the court in

admitting in evidence the dying declaration of the deceased.

Response to the first complaint requires consideration of the evidence, which was, in brief, as follows: The appellant, Joe Collins, Charlie Wallace and the deceased all met at a house conducted by one Boyd Cates in the outskirts of Slaughtersville, Hopkins county, at which a drink known as "nutra malt" was sold. The parties remained there about two hours and during that time took several drinks, treats being given by appellant, Collins, and the deceased. The witnesses, other than appellant and one Will Reynolds, introduced in his behalf, testified that they saw nothing unusual in the conduct of the parties while in Cates' house, except that they were hilarious from drink and all more or less intoxicated. It is true several of the witnesses testified that at one time, while they were in Gates' house the deceased attempted to step in the rear of appellant and was ordered by him not to get behind him, to which deceased replied, "All right," and walked away. The good humor of the assembly is shown by the fact that just before they left the house appellant indulged in a song. It was, however, testified by appellant that while in the Cates house Joe Collins had a pistol in his hip pocket, upon which he placed his hand and advanced toward appellant when the latter refused to promise him that he would attend his (Collins') trial in the police court the next day to answer a charge of drunkenness for which he had been arrested the previous afternoon, and at the same time Wallace had a knife in his hand and deceased a knife in his pocket which appellant claimed to have seen him open and place there; that the three persons named were attempting to close in on him, but stepped back when he ordered them to do so. None of these belligerent manifestations mentioned by appellant were seen by the other witnesses except Will Reynolds, who testified that he saw the knife in the hands of Wallace and that Collins had one hand in his pocket, but that as they were advancing toward appellant he said, "I am not going to stand anything like that; you fellows will have to stand back;" that they did stand back and appellant thereupon commenced to sing. According to all the witnesses the parties all went out of the house and returned once or twice before they finally took their departure; that at the end of two hours Cates announced he would have to close the house and go

home, by which time Collins, Wallace and deceased were so drunk that they were barely able to keep their feet. When Cates announced his purpose to close, all the persons present left the house. According to appellant's testimony, when he, Wallace, Collins and deceased got out of the house they attempted to get around him as in the house and he told them good night and walked away and was followed by deceased and Wallace, whereupon he asked them what they wanted, to which they made no answer but kept coming toward him; that he told them to stop and Wallace did stop but deceased kept advancing with a knife in his hand, and that when deceased failed to stop after being told by him to do so, he shot twice, one of which shots struck deceased in the stomach and perforated his bowels, causing his death the following day in, or on his way to, an Evansville hospital to submit to a surgical operation for relief from his wound.

The foregoing testimony of appellant was, however, contradicted by that of Collins, Wallace, Hawkins, Crowley Pleasant and Whit Ashby, whose testimony, particularly that of Pleasant and Hawkins, was most damaging to appellant. Pleasant, among other things, testified that he heard some cursing just before the shooting began; that appellant was cursing deceased and he heard him say to deceased, "God damn you, tell me good night," that deceased did tell him good night and appellant then said to him, "I'll tell you in a way, God damn you, you'll never forget," immediately after which the shots were fired, seven altogether, after five of which were fired Pleasant heard someone that he took to be Wallace say, "Now you have killed him. Now, God damn you, kill me," to which the voice that he took to be appellant's replied, "Just as you say, not as I give a damn," and two more shots were fired. Shortly after the shooting appellant came back by the hotel where the witness saw him as he passed. Wallace, who was at the place of the shooting, corroborated the testimony of Pleasant. According to the testimony of Roy Brown, appellant, shortly after the shooting, made of him the inquiry, "Is he (meaning the deceased) dead yet? All I hate about it is I got him and didn't get the other (or others)." Luther Whistler testified that after deceased was carried, the night of the shooting, to the railroad station, appellant entered the station about twenty minutes later and inquired of him what he knew about

804 KENTUCKY REPORTS. [Vol. 172.

the shooting, and upon being told that he knew nothing appellant said, "I shot Griffin. I don't know whether I killed him or not; I hope I did; and all I hate about it, I didn't get the other son of a b——." Whistler said to him, "I wouldn't talk that way," to which appellant replied, "I want to tell you that two sons of b—— tried to poison me with whiskey and carbolic acid and that was the cause of this here." Appellant denied making these statements to Brown and Whistler and also testified that about a month before the shooting of deceased the latter called him to one side and asked him if he would like to have a drink of whiskey, and upon receiving an affirmative answer pulled from his pocket a bottle which appellant, upon putting to his mouth for the purpose of taking a drink, but before drinking therefrom, discovered contained carbolic acid, whereupon he threw the bottle down and left deceased.

Jesse Brooks, a witness introduced in appellant's behalf, testified that in the afternoon and shortly before the killing of deceased, he tried to borrow from him a gun, saying he wanted to get that fellow, and upon being asked by Brooks what fellow he was talking about replied, "Cavanaugh." It does not appear, however, from the testimony of appellant and Brooks or that of any other witness, that the deceased, Wallace or Collins had ever had a difficulty with appellant or manifested any ill will toward him, and no explanation was given by appellant as to why the deceased should have tried to kill him with carbolic acid or have borrowed a pistol with which to take his life, nor was there anything in the testimony of Brooks conducing to show any cause for deceased's desire to obtain the pistol with which to kill him. In view of the absence of a showing of a motive on the part of the deceased for injuring or taking the life of appellant, and the proof of the friendly terms upon which they met in the house of Cates previous to the killing, to say nothing of the other evidence conducing to show the agreeable relations of the parties, at all times, the above testimony of appellant and Brooks is hardly consonant with reason. Our reading of the evidence furnishes us no reason for sustaining the contention of appellant's counsel that it does not support the verdict of the jury. On the contrary, we think it amply sufficient to that end, even without the testimony admitted as the dying declaration of the deceased.

Where, in a criminal case, the question of the guilt of the defendant depends upon whether the witnesses for the Commonwealth or those for the defendant are to be believed and this court is unable to say that the verdict is flagrantly against the evidence it is its invariable rule not to interfere with the verdict of the jury. Chaney v. Commonwealth, 149 Ky. 464; Black v. Commonwealth, 154 Ky. 144; Slaughter v. Commonwealth, 152 Ky. 128; Hendrickson v. Commonwealth, 165 Ky. 665.

No reason is apparent for sustaining appellant's second complaint, which questions the correctness of the instruction of the court as to murder and voluntary manslaughter. It is the contention of his counsel, first, that it was prejudicial to appellant for the trial court to define murder and voluntary manslaughter in the one instruction, and second, that the instruction did not correctly state the law with respect to voluntary manslaughter. As to the first objection it is only necessary to say that the practice of giving the law to the jury on the subject of murder and manslaughter in one instruction is proper and has received our approval. Ball v. Commonwealth, 125 Ky. 601.

The second objection is that it was error for the court to instruct the jury that in order to constitute the crime of voluntary manslaughter it was necessary that the killing should have been done in sudden affray or in sudden heat of passion *and* upon provocation ordinarily calculated to excite the passion beyond control; it being in the sudden heat of passion without provocation, there must be added to the instruction following the word "passion" the words "and upon provocation ordinarily calculated to excite the passion beyond control." On the other hand, a killing upon provocation ordinarily calculated to excite the passion beyond control, would not make the killing voluntary manslaughter if the provocation did not, in fact, produce the sudden heat of passion, which is an essential ingredient of the offense. If there is, therefore, nothing said or done by the party killed that would constitute provocation ordinarily calculated to excite the passion of the party doing the killing beyond control, the latter would be without cause to claim that he acted in sudden heat of passion. So to constitute voluntary manslaughter the killing must be done either in a sudden affray or in sudden heat of passion *and* upon provocation ordinarily calculated to excite the passion

beyond control.   In Hobson, etc., on Instructions, section 742, a form of instruction is given which not only contains in the one instruction the law with respect to both murder and voluntary manslaughter, but in stating the law as to the latter offense uses language identical with that of the instruction given in the instant case.

Appellant's third complaint is as to the trial court's ruling in refusing to permit the appellant to answer the following question: "Did you shoot Leonard Griffin in your own necessary self-defense, to protect yourself from great bodily harm or death at his hands, as you then believed?" To which, according to the avowal in the record, he would have replied, "Yes." It would be impossible to frame a question more leading in form or suggestive of the answer desired than the one quoted, and because of its leading character its exclusion by the court was proper.   Its exclusion was also proper because the answer it would have elicited from appellant was previously given by him in better and more elaborate form in response to a question which was neither leading nor suggestive.   That question was, "What made you shoot?"   And his answer to it, "I shot to protect myself.   I believed that the man was coming onto me with a knife and was going to do me some injury."   In a criminal prosecution it is permissible for the defendant to state, if such be his defense, that the killing of the deceased was in defense of his person or to protect his person or life, but such testimony, like all other testimony, must be brought out by the asking of a competent question.   It is manifest from what has been said that appellant's third complaint is wholly lacking in merit.

Appellant's fourth complaint, relating to the trial court's refusal to permit the moral character of the witness Humphrey Hawkins to be impeached, must be sustained.  Section 597, Civil Code, which applies to criminal prosecutions as well as civil actions, allows a witness to be impeached by the party against whom he testifies, "by contradictory evidence, by showing that he has made statements different from his present testimony, or by evidence that his general reputation for untruthfulness or morality renders him unworthy of belief; but not by evidence of particular wrongful acts, except that it may be shown by examination of a witness or record of a judgment, that he has been convicted of a felony." It will be observed that one of the methods provided by

this section for impeaching a witness is to show that his reputation for morality is bad. This makes the general moral character of the witness a fair subject of inquiry. The inquiry may be confined to an attack upon his reputation for untruthfulness or it may be directed alone to a showing that his moral character is bad. So the jury may determine from the attack on either, if it be successfully made, whether the witness is worthy or unworthy of belief. Thurman v. Virgin, 18 B. Mon. 785; Turner v. King, 98 Ky. 253; Davis v. Commonwealth, 95 Ky. 19. It is patent, therefore, that the exclusion of the evidence offered to impeach the character of the witness Hawkins was error, but as an error, to authorize a reversal of the judgment, must be such as to have prejudiced a substantial right of the defendant, it remains to be determined whether this error is of that character, and this determination must be arrived at from a consideration of the whole case. Section 340, Criminal Code.

To authorize the reversal of a judgment of conviction for felony upon the ground of the rejection of evidence offered on the part of the defendant, it is not sufficient that the rejected evidence be shown to have been merely pertinent or relevant or technically admissible. It must also be important for the defendant in view of the whole case as presented. Champ v. Commonwealth, 2 Met. 17. In view of the fact that several witnesses, other than Hawkins, introduced for the Commonwealth, furnished abundant evidence, not only as to the matters testified to by Hawkins, but also as to other facts which, with all other evidence in the case, authorized the verdict of the jury, without Hawkins' testimony, we are constrained to hold that the error committed by the court in excluding the evidence offered to impeach the character of the latter, could not have prejudiced any substantial right of the appellant.

The alleged misconduct of the Commonwealth's attorney in argument to the jury, presented by appellant's fifth complaint, consisted of the following statements made by that officer: "That he was the Commonwealth's attorney and had the sole right to argue, construe and interpret the instructions of the court, the law of the case to the jury; and that the attorneys for the defendant had no right nor business arguing the instructions, construing the instructions or interpreting the instructions," and again, "That even if the killing was done in sudden heat

and passion and in sudden affray, still there would have to be circumstances ordinarily calculated to arouse passion beyond control, before the killing could be voluntary manslaughter.''

As to the first of these statements it is sufficient to say that though it was highly improper, as the complaint thereof was not embraced in the motion and grounds for a new trial, we are without authority to consider or pass upon the objection now made to it. As the second statement of the Commonwealth's attorney, though complained of in the motion and grounds for a new trial, constitutes a substantially correct statement of the law and conforms to what we have already said in approval of the instruction defining voluntary manslaughter and advising the jury in that state of case they would be authorized to find appellant guilty of that crime, it is hardly necessary to add that the refusal of the court to exclude the statement from the jury and admonish them not to consider it, was not error.

The appellant's sixth and final complaint involves a more serious question, viz.: were the statements of the deceased made after he was shot, admitted by the trial court as dying declarations, competent as such? Dr. Tanner, his attending physician, upon examining his wound, told him that there was but one chance for him to live, which chance could only be afforded by an immediate surgical operation, which might or might not save his life. To his wife when asked with reference to his going to Evansville for the surgical operation, if he wanted a cot, he said ''No, he wanted to ride the cushions (meaning the car seat) because he would have to ride back in the baggage car.'' He then said to her that ''He would never get well; that he would not or could not live.'' When asked by her who shot him he said, ''Frank Cavanaugh.'' She then asked him what he was doing and why, appellant shot him, to which he replied, ''He wasn't doing anything. He shot me just because he could.'' To Tom Drake he said, ''He didn't know that Cavanaugh had anything against him.'' To John Griffin, his brother, he said, when asked why Cavanaugh shot him and whether he had had any previous trouble with him, ''I did not know Cavanaugh had anything in the world against me last night or any other time. He shot me just because he could.'' To Frank McEwen he said he was going to die, and when asked by the latter if he had bet-

ter not have a cot for the trip to Evansville he said "No, I will ride in a baggage car coming back." Also that "he was shot without cause and was not doing anything to Cavanaugh." That part of the deceased's statement to McEwen to the effect that he was shot without cause, testified to by McEwen, was excluded from the consideration of the jury by the court, presumably upon the ground that it was a mere expression of the deceased's opinion and therefore incompetent. Dr. Tanner, after testifying for the Commonwealth, was recalled by appellant and in response to the interrogation of his counsel said: "Mr. Combs asked him (deceased) if he had any trouble with Cavanaugh previous to that night and he said he had not. Well he said, why did Frank shoot you? And he said, I don't know. I do not reckon he aimed to. Yes, I guess he did, too. Remarked, why did he shoot you and he said I do not know." Nearly all the witnesses were asked whether in any of the statements made to them by deceased there was any expression of belief or opinion from him that he would recover from his wound and from each came the same answer, that no expression of opinion or intimation to that effect was given by the deceased and that to practically all of them he expressed his belief that he would die.

We think so much of the deceased's statements as amounted to a mere expression of opinion that he was shot without cause, made to McEwen, was properly excluded by the court, and for the same reason that part of the statements made by him to his wife, Annie Griffin, and to his brother, John Griffin, to the effect that "He shot me just because he could," should also have been excluded as a mere expression of opinion and tantamount to the statement, "He shot me for nothing," which, in Allen v. Commonwealth, 168 Ky. 325, was held incompetent because a mere expression of opinion. But the numerous other declarations of deceased, to the effect that he was shot by appellant, that he was not doing anything when shot; that he did not know the appellant had anything against him; that he had had no previous trouble with him, and the like, were all competent and properly admitted, as were his further declarations conducing to show that he believed his death inevitable and near at hand. As said in Allen v. Commonwealth, supra, quot-

ing with approval from Peoples v. Commonwealth, 87 Ky. 487:

"The law does not require as a condition to the competency of the statement as a dying declaration that the injured party shall, in express words, declare that he knows he is about to die, or that he shall make use of equivalent language. His recognition of impending dissolution may be shown in this way, but the law does not limit it to this mode alone." Eversole v. Commonwealth, 157 Ky. 478; McHargis v. Commonwealth, 15 R. 323; Pennington v. Commonwealth, 24 R. 321; Jones v. Commonwealth, 20 R. 235; Terrell v. Commonwealth, 13 Bush 246; 1 Greenleaf, sec. 158.

In our opinion the failure of the court to exclude from the jury the single expression of opinion contained in the statements to his wife and his brother, John Griffin, was not prejudicial to appellant, in view of the competency of the statements in other respects and of those made by the deceased in the presence of Dr. Tanner, in which there was no such expression of opinion. Our conclusion that the admission of the evidence proving the expressions of opinion made by deceased was not prejudicial to appellant, is fortified by the further conclusion at which we have arrived, that the evidence, other than that of the declarations of deceased, appearing in the record, authorized the verdict.

Under section 340, Criminal Code, the reversal of a judgment of conviction is not permissible unless upon consideration of the whole case the Court of Appeals is satisfied that the defendant has been so prejudiced in some substantial right as to have been deprived of a fair trial. So it is a well settled rule of this court, repeatedly announced in its opinions, that it will not reverse a judgment or remand the case for a new trial except in the manner and on the grounds authorized by the section of the code, *supra.* Overstreet v. Commonwealth, 147 Ky. 471; Parish v. Commonwealth, 136 Ky. 77; Henson v. Commonwealth, 139 Ky. 173; Middleton v. Commonwealth, 136 Ky. 354; Oldham v. Commonwealth, 136 Ky. 789; Renaker v. Commonwealth, 172 Ky. 714.

Applying that rule to the case here presented, it is our opinion that the record shows no such error committed by the trial court as will compel a reversal of the judgment, hence it is affirmed. While court sitting.