## Begley v. Commonwealth.

(Decided October 23, 1925.)

## Appeal from Lee Circuit Court.

1. Criminal Law—Evidence of Consciousness of Impending Death Held Sufficient to Admit Dying Declarations.—In prosecution for murder, where witnesses testified to declarations by deceased after he was shot and before he died, held that such testimony was not erroneously admitted, in view of statements by deceased to witnesses that he knew he was going to die, and made positive declaration five hours before death that he had to die.

2. Homicide—Erroneous Admission of Dying Declaration Not Prejudicial where Other Competent Dying Declarations were in Evidence.—In prosecution for murder, declarations made by deceased to certain witnesses, if erroneously admitted as dying declarations because deceased at time had no fear of impending dissolution, held not prejudicial to defendant in view of other competent dying declarations to same effect in evidence.

3. Homicide—Consciousness of Impending Death May be Shown from Circumstances.—The law does not require, as a condition

to the competency of a statement as dying declaration, that maker thereof shall expressly declare he knows he is about to die, but his recognition of impending dissolution may be shown from circumstances, or from what declarant may have said, or from both.

4. Homicide—Failure to Give Charge Defining Right of Defendant to Defend His Home and Family Not Error in View of Evidence.—In prosecution for murder, failure to charge on defendant's right to defend home and family was not erroneous, where deceased was not a trespasser in defendant's home, but was a visitor and regarded as a guest, and there was no evidence of his interference with accused's property rights or safety of his family.

5. Homicide—Conviction for Manslaughter Held Not Flagrantly Against Evidence.—In prosecution for murder, conflicting evidence held sufficient to sustain conviction of voluntary manslaughter.

6 Criminal Law—Judgment Reversed as Flagrantly Against Evidence Only when it Shocks Conscience and is Result of Passion or Prejudice.—Reviewing court is authorized to reverse judgment as being flagrantly against the evidence only when it appears that it was so much against the weight of evidence as to shock the conscience and to clearly appear to be the result of passion or prejudice on the part of the jury.

BLAKEY & BLAKEY and S. P. STAMPER for appellant.

FRANK E. DAUGHERTY, Attorney General, and GARDNER K. BYERS, Assistant Attorney General, for appellee.

## OPINION OF THE COURT BY JUDGE SETTLE—Affirming.

September 6, 1923, the appellant, Barney Begley, shot and wounded Floyd Evans. The wounds, of which there were four, caused the death of Evans, which occurred about two weeks later in a hospital in the city of Lexington, to which he was carried the night following the shooting for surgical treatment. The parties were residents of Lee county, this state, and the shooting and wounding of Evans occurred in that county. At the October term, 1923, of the Lee circuit court, an indictment, charging the appellant with the murder of Evans, was found and returned by the grand jury. On his trial at the May term, 1924, of the court, for the crime charged in the indictment, the appellant, by verdict of the jury, was found guilty of voluntary manslaughter and his punishment fixed at confinement in the penitentiary for a term of twenty-one years. He was refused a new trial.

and has appealed from the judgment entered in pursuance of that verdict.

The rulings of the trial court assigned as error entitling the appellant to the reversal of the judgment of conviction, are as follows, viz.: (1) The admission of incompetent evidence in behalf of the Commonwealth. (2) Failure to properly instruct the jury. (3) Overruling of the appellant's motion for a directed verdict of acquittal, urged by the latter on the ground that the evidence was insufficient to authorize the submission of the case to the jury.

The shooting and wounding of the deceased took place about 11 o'clock a. m. at the home of the appellant, after three hours of card playing in which they were the only participants. The only eye-witnesses of the shooting were the deceased, the appellant and Myrtle Terry, a sister-in-law of the latter. The deceased's version of what then occurred is contained in certain statements made by him, first, on the day of and after the shooting, to John Durbin, Bob Ross and Susie Ross; and later, more explicitly repeated five hours before his death, to his father, Jesse Evans. These statements were introduced in evidence by the Commonwealth through the testimony of the several persons named and admitted by the trial court as dying declarations of the deceased.

Durbin testified that when informed of the shooting and wounding of the deceased by the appellant, which was about three hours after its occurrence, he went to the appellant's residence and there found the deceased lying in bed and suffering from his wounds. That the latter when asked by him (Durbin) "if he was hurt," said: "Yes, John, I guess I am killed;" and when further asked by Durbin why he was shot by the appellant, deceased replied, in substance, that he and Begley were gambling; that he "broke Begley and Begley got mad and commenced shooting." The deceased also said he did not know Begley was mad until he began to shoot at him, and that just before, or when, the shooting began he was "aiming to give Begley a drink" from a jar of whiskey he (deceased) had taken to the latter's residence; and that the pistol with which Begley did the shooting was obtained by him under the pillow of a bed near him.

The witness, Susie Ross, a near neighbor of the appellant, testified that on the day of the shooting and wounding of the deceased and before he was seen by

Durbin, she was called to the appellant's home by his wife, and while there saw and talked with the deceased who, when asked by her as to his condition, made (in the words of the witness) the following reply: "He said he was going to die, said he wasn't going to live, said he knowed he was killed." That she (witness) asked the deceased "how it (the shooting) happened," and his reply was: "Why, we was gambling."

It appears from the testimony of the witness, Bob Ross, that he visited the deceased at the appellant's home during the late afternoon, or night, of the day he was shot, and while there had with him the following conversation:

"I (the witness) said, 'Well, Floyd, how are you?' 'Well,' he said, 'I am in bad shape, I guess I am killed.' I said, 'I hope not.' 'Yes,' he said, 'A man can't stand all this. This is too much.' 'I said, 'How came that fellow to shoot you, Floyd?' 'Well,' he said, 'I don't know. . . . We had been gambling some and he had a gun of mine in pawn. . . . I won what money he had and broke him. . . . I won my gun out of pawn and called for it and he refused to give it up. We got in kinder of an argument and all at once he grabbed it,' I believe he said, 'off the bed.' "

The witness, Jesse Evans, who was in the hospital with his son, the deceased, at the time of his death, when asked, "What statement, if any, was made by the deceased with reference to his condition, and whether or not he expected to get well or what should happen to him," gave the answer: "Well, he told me he had to die." It also appears from the testimony of this witness that the deceased, at the time of making the above statement, had with him a conversation in regard to the shooting and wounding of the latter by appellant, which, as related by the witness, was as follows:

"Well, I (witness) asked him (deceased) how the trouble came, and he said him and Begley had been playing cards and he broke Begley, won everything he had; that Begley had his pistol in pawn and he won it back, called for it and asked him what about his pistol, and Begley said I don't know what about it; that he (deceased) was standing there talk-

ing and he said Barney reached under the pillow, pulled his pistol and commenced shooting him.''.

The witness further testified that the foregoing statements of the deceased were made about five hours before his death. In addition to the evidence thus far discussed, it was shown by other evidence introduced for the Commonwealth, mainly found in the further testimony of the witness Durbin, that the deceased and appellant were accustomed to meet at the latter's home to engage in gaming by card playing; and that he (Durbin), appellant and deceased were together engaged in such gaming at the appellant's house three or four nights prior to the shooting of the deceased by the latter, on which occasion, as substantially testified by the witness, the deceased, after obtaining of the appellant $3.25 on a cold check of one Fred Slone for that amount, and the further sum of $10.00, for which he pawned his pistol, lost to him in the card playing the whole of these two amounts; but that when later in the evening deceased won enough money to redeem his pistol and offered to do so, the appellant refused to return the weapon unless deceased would also return him the amount he obtained of him (appellant) on the Slone check. The latter declined to comply with this demand and left the appellant's residence without the pistol.

It was also testified by Durbin that on the night in question he remained a short time at the appellant's house after the deceased left, and that while there with the appellant the latter, in declaring to him his resentment of the deceased's failure to pay him the amount of the Slone check, said: "That G— d— son of a b— don't pay me that money back for that check, I will kill him."

Eliza Brown, another witness for the Commonwealth, testified that the lot upon which she resides adjoins that occupied by the deceased as a home at the time of his death, and also near and in view of the home of the appellant; that she had, on at least three occasions and but a short time prior to the shooting of the deceased, seen the appellant go to the latter's home and call for him, and that on the day before he shot the deceased she saw appellant go to the home of deceased and heard him there inquire of a son of the deceased where he was; and upon the son's replying that he had gone to his work, the appellant told him to tell the deceased to come to his

(appellant's) home in the morning, *i. e.,* the morning upon which he was shot and wounded by him.

Upon taking the witness stand in his own behalf, the appellant admitted that he shot the deceased four times, but claimed that he did the shooting in his necessary self-defense. He likewise admitted his flight from his home and the state immediately after the shooting to Hamilton, Ohio, where he remained until arrested and brought back to Lee county, this state, for trial, following the return of the indictment charging him with the murder of the deceased, Floyd Evans. His account of what transpired at the time he shot and inflicted upon the deceased the wounds which admittedly caused his death, is substantially set forth in the following parts of his testimony:

"Well, he come to my house that morning with half a gallon of whiskey, he came and knocked on the door, and I spoke to him, and he said 'murder,' and I just thought he was saying it for a joke. He come in and set his whiskey down and said, 'Begley, by hell it takes $2.50 to get a drink of it.' I hadn't never put my shoes on and I went and eat my breakfast and got down and sent down to Bob Ross and got a razor. I borrowed it and shaved his neck, and after I shaved his neck he asked me to play some cards with him, and I said I didn't want to play no cards. He wanted to play, and we went in there and I went to playing two or three games of pitch with him. He was on that side of the bed next to the door and I was on this, and I stopped playing, and he asked me to go out on the hill with him to make a run of whiskey, said 'he had a still out there.' I told him no I couldn't leave home that day. Then he asked me for my pistol and I told him no I couldn't let him have it. The gun was lying on the bed by a pillow and he made a grab at it, and I made a grab and beat him to it; and he said, 'God damn you, I will kill you or have that gun,' and I put the gun in my pocket, and he told me to give him that gun or he would kill me and kept coming on and telling me he would kill me or have the gun, and I kept telling him to stand back off of me and not to come on me. He had me hemmed in this corner, and I told him three times not to come on me or I would shoot you; and he come on me and I shot him."

Further testifying, the appellant, in answer to the following question from his counsel: ''Now, tell the jury what you believed he was going to do when you shot there?'' said: ''I thought he was going to kill me.''

It will be found from other parts of the appellant's testimony that he denied the deceased's ownership of this pistol with which he shot him, and claimed that he had bought it from him about two weeks before the shooting. But he did not deny that the pistol had originally been pawned or pledged to him by the deceased, as declared by the latter after he was shot, to secure the payment of ten dollars he had loaned him. Nor did he deny the statement repeatedly made by the deceased after the shooting, that when shot he was tendering to appellant the ten dollars for which he had pawned the pistol and was demanding its return. Moreover, he did not testify that deceased when shot by him had, or attempted to draw, a pistol or other weapon.

The appellant's testimony does, however, deny the threat against the deceased attributed to him by the witness Durbin; and also that of Eliza Brown as to the message she claimed was sent by him to the deceased, through his son, to come to his home on the day he was shot.

The only corroboration of the appellant's version of the shooting is found in the testimony of his sister-in-law, Myrtle Terry; but it is not to be overlooked that the testimony of this witness, that no gambling attended the card playing engaged in by the appellant and deceased before the shooting of the latter, was contradicted by two members of the grand jury by which the indictment was returned, both of whom testified that she (Myrtle Terry), in testifying before the grand jury with reference to the facts connected with the shooting, stated that the appellant and the deceased were then gambling, and there was no attempt on the part of the appellant to prove by any other member of the grand jury that she did not so testify.

It may further be said of the testimony of Myrtle Terry that, of the several witnesses who testified as to the statements made by deceased after he was shot, she alone claimed to have heard him say ''that if he was taken to the hospital right away he would get well in a week or two.''

The evidence complained of as incompetent in the first contention of the appellant is that admitted by the trial court to prove the declarations of the deceased made after he was shot and before his death. We find no merit in this contention. If the only statements made by the deceased were those heard and testified to by the witnesses, John Durbin and Bob Ross, it might well be questioned whether they were sufficient to show that they were made under such a sense of impending dissolution as was necessary to entitle them to be admitted as dying declarations. But it will be recalled from what has been said of the evidence that, preceding the statements made by the deceased to the witnesses named, there was one made by him to the witness, Susie Ross, containing a definite assertion that "he was going to die . . . wasn't going to live, . . . " and *"knowed* he was killed." And when to this is added the further statements, relating the occurrences of the shooting, made by him to Jesse Evans five hours before his death, and which began with a positive declaration of the deceased that "he had to die," little doubt can exist as to the competency of any of the several statements, bearing on what transpired when he was shot, that were made by the deceased between the time of the shooting and his death. But if it should be conceded that the statements of the deceased to Durbin and Bob Ross were incompetent, their admission as evidence could not, in view of the undoubted competency of the statements made by the deceased to Susie Ross and Jesse Evans, have prejudiced the appellant in any substantial right.

While it is true that this character of evidence should be received with great caution, the law does not require as a condition to the competency of the statement as a dying declaration that the maker of it shall in express words declare that he knows he is about to die. Unquestionably his recognition of impending dissolution can more convincingly be shown in this way, but the manner of showing such recognition is not restricted by the law to this mode alone. It may also be shown by the testimony, by circumstances, or from what the declarant may have said, or from both, that the statement offered as a dying declaration was made when the declarant was *in extremis* and believed his death was near. McHargess v. Commonwealth, 15 R. 324; Postell v. Commonwealth, 174 Ky. 272; Cavanaugh v. Commonwealth, 172 Ky. 799. It

follows from what has been said that the appellant's first contention must be rejected.

His second contention, that the trial court failed to properly instruct the jury is, in our opinion, without merit, No criticism of the instructions given by the court is indulged in by his counsel. They merely urge that another instruction, defining the right of the appellant to defend his home and family, should have been given. It is sufficient to say that such an instruction would have been unauthorized and misleading. The deceased was not a trespasser. He had been a frequent visitor there, and on this occasion, as at all other times, was welcomed by the appellant. Indeed, according to the testimony of Mrs. Brown, whose credibility as a witness was unattacked, he was a guest of the appellant by the latter's invitation, and there was no evidence that he while in the home of the appellant interfered with his property, invaded the rights or endangered the safety of any member of his family. This being true, the case, as held in Stanfill v. Commonwealth, 209 Ky. 10-14, is not one "presenting the rights of the owner to the protection of his property (or family) against the unlawful acts of a wrongdoer."

The appellant's final contention that the verdict is unsupported by and flagrantly against the evidence, merits little consideration. The evidence was obviously conflicting, but it cannot be said that the facts and circumstances thereby presented do not support the verdict. It was the province of the jury to weigh it all and pass upon the credibility of the witnesses. This was performed by the jury, and, as said in McCurry v. Commonwealth, 205 Ky. 211:

"We are authorized to reverse a judgment as being flagrantly against the evidence only when it appears that it was so much against the weight of the evidence as to shock the conscience and to clearly appear that it was the result of passion and prejudice on the part of the jury."

Judgment affirmed.