## Bigby v. Commonwealth.

(Decided April 29, 1938.)

OSCAR M. SMITH for appellant.

HUBERT MEREDITH, Attorney General, and WILLIAM F. NEILL, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—Affirming.

An indictment returned by the grand jury of Logan county on May 19, 1937, charged appellant with the murder of Elwood Spencer, a colored man. He was found guilty of voluntary manslaughter, and his punishment fixed at two years' imprisonment in the state

reformatory; the minimum in such cases. Section 1150, Kentucky Statutes.

While four or more grounds were set up in support of the motion for a new trial, which the court overruled, appellant urges only as ground for reversal that the verdict of the jury is flagrantly against the evidence. Under our rules we treat the grounds not discussed as waived, leaving us to consider solely the one mentioned.

The deceased was a colored boy about twenty-seven years of age, living out in the county some miles from Russellville, in which city the homicide occurred at about 11 o'clock on the last Saturday night of February, 1937.

At the outset it may be said that the Commonwealth proved, and the accused admitted, that he fired the shots which caused Spencer's death, so the only question we are to consider is whether or not the proof adduced by accused was sufficient to justify the verdict of the jury in determining that he did not fire the fatal shot in self-defense.

Grif Taylor, a companion of deceased, had come to Russellville with him on the Saturday afternoon. They proceeded to what is known as "Black Bottom," evidently a portion of the city not inhabited by the better class of citizens. They spent most of the afternoon there, and remained until the time of the homicide, visiting first one place and another where food and drinks were sold, games and dancing indulged in, and where white and colored people congregated to some extent.

Taylor says that around 10 o'clock he and deceased went to Merritt's restaurant, and from there across the street to Miss Cora's restaurant, where each procured a fish sandwich. They left there, eating their sandwiches, and went across the street to a pool room on the opposite corner. The night, as is said by some witnesses, was dark, and it was snowing, which made it a little difficult to see, except by the aid of lights from the various business places. This witness says he and deceased had gotten to some point in front of the pool room,—whether on the sidewalk or still in the street is not clear—when accused walked up near Spencer, holding his pistol in his hand, and said he had been "aiming

to shoot him for some time." He at once fired the pistol, striking deceased "in front twice," and again in the back after he had fallen. Appellant after the firing of the pistol, a .38 caliber, disappeared from the scene. This witness testified that prior to the firing of the pistol by accused, Spencer had not said a word to appellant. He stated that when appellant announced that he had been "aiming" to kill Spencer, both he and Spencer begged him not to shoot. He says neither he nor Spencer were armed at the time, and Spencer was then engaged in eating his sandwich. The witness also says that Charlie Bigby, son of the defendant, and who was with his father, said: "Now is the time to do it." According to witness, both he and Spencer were sober. They had bought a half pint of whisky at one of the places visited, but it had not been opened.

Bennie Harshaw testified that he was standing inside Gaines' restaurant near the front window and saw the shooting. He was about ten feet away, but saw appellant fire three shots in rapid succession, and which were fired near the front of the pool room. The shots took effect, and Spencer fell right where he was standing. He heard nothing said by any of the parties, and did not think there was much argument, though they looked as if they were talking "backward and forward to one another for five minutes." He saw appellant pull his pistol "out from under his arm," and says that at the time Spencer was not advancing on appellant, nor walking toward him. The Spencer boy was "eating something."

George Allison was "back outside the pool room," and heard, but did not see, the shooting. He saw appellant pass him before the shooting, and heard him say, "You are meddling," and in a few minutes heard the shots, and then saw appellant going toward Merritt's restaurant unloading his pistol. He went to where Spencer was lying and Spencer said "Somebody do something for me; get a doctor."

Bryan, a police officer, went to the scene some time after the shooting, but his testimony throws little light on the matter. He did say that appellant surrendered to him, that he had a "piece of a half-pint" and admitted that he had taken two drinks, but showed no untoward effects from the drinking. He also says that he had seen Taylor, companion of Spencer, earlier in the

night—about 9 o'clock, and he was drinking "pretty heavily."

Spencer was taken to the Bowling Green City Hospital, where he died the following morning. He was examined there by a doctor, who concluded that nothing could be done which would be of benefit. This doctor testified that he observed only two wounds on the body, both entrance wounds, one in the abdomen about two inches below the navel, and the other on the left side, about four inches from the spine. He found no points of exit. He made no probe, since he concluded Spencer was beyond hope. The undertaker who prepared Spencer's body for burial says there were three distinct wounds which he closed, describing the two mentioned by the doctor, and a third in the back, about an inch above the belt, and about one inch from and on the right side of the spinal column. This evidence shows how easily conflicts arise and illustrates little as to the real issue in the case, but if the undertaker's evidence be accepted, it has a tendency to bear out the testimony of the witness who said appellant shot Spencer after he had fallen.

The sharp conflict arises when we come to consider the testimony of the accused. He is a man sixty-five years of age, a tenant farmer. He had known Spencer "a long time." Accused drove into town on the Saturday afternoon and parked his car in the "Bottom" near a brick restaurant, and went up into the main part of the city, and remained some time. Later, and before nighttime, he went back to the "Bottom" to a restaurant, and then "first one place and another," until about the time when the shooting occurred. He, his son, and Wig Mason were crossing the street from Miss Cora's restaurant toward Merritt's place, and when near the middle of the street he met Spencer and Grif Taylor. Spencer called to appellant and asked him for a drink of whisky, and appellant replied that he had none. Appellant says that accused said, " 'You are as dirty as hell;' said he knowed a man was going to hit me, and I didn't say nothing about him, I said, 'I haven't got nothing to do with that.' " Appellant says that Spencer kept "cussing and raring," and said "just a little and I would go on and beat the hell out of you and I turned round and started back, and when I went over by the pool room he come on over there. * * * Wig and Charlie were with me. He come up and began

cussing again, and said, 'Damn your dirty soul, I will kill you in a minute.' I looked at him and he had a knife in his hand. I said, 'You go on away from here, I don't want to have no trouble with you,' * * * and my boy stepped in between us and said, " 'Tuck you all go on', and Tuck said, 'Damn you, I will kill you,' and broke at me with that knife. I got a pistol out of my side scabbard here and shot at him three times, * * * and went and gave up. I shot to keep him from killing me, coming on me with a knife." Appellant said he had had nothing to drink up to that time, save two bottles of beer, which statement is in conflict with that of the arresting officer. The son, Charlie Bigby, died between the date of the examining trial and the final trial, but by some means his deposition was taken in the interim, and on trial was read to the jury Wig Mason, who appellant says was with him and the son at the time of the homicide, did not appear at the trial, and an affidavit setting out what he would have testified, if present, was read to the jury. Both these witnesses, in that manner, corroborated the testimony of appellant, though not completely in detail.

One witness for accused was standing by the pool room door at the time of the shooting; he saw appellant "first" near the pool room. Mason and appellant's son were with him. In a very brief period of time deceased and Grif Taylor came up. Spencer was cursing, and told appellant he would kill him, and had a knife in his hand. Appellant "asked him not to come on with the knife; told him to go on and leave him alone, he didn't want to have any trouble," and then appellant fired three shots, and "that stopped him and he fell."

Jim McKinney was inside Merritt's restaurant just before the shooting, and came out on the sidewalk just before it occurred. He heard some argument between the parties between the Merritt restaurant and the pool room. He heard, as he says, "Spencer say to appellant, "G. D. you, I will kill you." He saw no weapons at that time. There was not much more said, then "Spencer went to crowding Bigby and he said, 'don't come on me with that knife' three times, and about that time the three shots was made." Spencer fell in the street and appellant turned and walked away. He saw no knife in Spencer's hand This witness insists that the shooting took place in the middle of the

street, whereas several of the witnesses say it was on the sidewalk in front, or near the front, of the pool room.

Walter Beason was on the street. He says the parties were standing by the pool room and he heard the man with the gun say, "I told you, you had better not come on me with that knife," and then one man fired the pistol. This witness states that he saw no knife displayed.

The foregoing is in substance all the testimony, except that some three or four witnesses were introduced who said that the reputation of deceased was that of being violent and dangerous when under the influence of liquor. However, on cross-examination, they all say that he was known as a "fist fighter: pretty handy with his fists."

On rebuttal Taylor says that before the shooting deceased had no knife drawn, nor did he threaten to kill appellant; that he did not see Mason around there at all; and that he and deceased did not follow appellant from the middle of the street toward, or near to, the pool room.

Thus it is seen that we have for consideration one of those cases where the evidence is sharply conflicting, and in which we are called upon to determine whether or not the jury's verdict should be set aside on the contention that same is flagrantly against the evidence. We have had the same situation before us time and time again, and have consistently adhered to the rule that where there was sufficient evidence to take the case to the jury, as is without the shadow of a doubt here, and the evidence was conflicting, as it is here, we cannot ignore the verdict of the jury, unless upon the whole case we are of the opinion that the verdict is flagrantly contrary to the evidence.

Here there was proof, and admission by the appellant, that he fired the shots which took the life of deceased. The only question in such cases to be decided by the jury is whether or not the act of the accused is excusable, because committed in his defense. Admission by the accused that he killed Spencer made it incumbent upon him to furnish proof that his act was excusable, under all the facts and circumstances. Whether or not he has so done is and as has always been, under

our repeated decisions in like cases, a matter peculiarly for the jury, Lickliter v. Com., 255 Ky. 471, 74 S. W. (2d) 918, 922, unless defendant's proof uncontradictedly establishes his defense without the possibility of doubt  See Privitt v. Commonwealth, 271 Ky. 665, 113 S. W. (2d) 49

In homicide cases where the Commonwealth proved, and defendant admitted the act of homicide, and accused produced testimony to show excuse therefor, whether the act or shooting and killing of the deceased was in self-defense, is a question for the jury. Francis v. Com., 260 Ky. 590, 86 S. W (2d) 310; Newsome v. Com., 236 Ky. 344, 33 S. W. (2d) 36; Karsner v Com., 235 Ky. 710, 32 S. W (2d) 43.

Analyzing the testimony, which we have given in substance, it may be said that if the witnesses for the Commonwealth are to be believed, the homicide was without excuse. On the other hand, if the testimony of the accused is to be accepted, he acted in his necessary self-defense. Where, as in the instant case, the guilt or degree of guilt depends on whether or not the witnesses for the one side or the other are to be believed, and we are unable to say that the verdict at once strikes us as being flagrantly against the evidence, it is our rule not to interfere with the verdict of the jury hearing the case. Hendrickson v. Com, 165 Ky. 665, 177 S. W. 438; Cavanaugh v. Com., 172 Ky 799, 190 S. W. 123

In the face of the testimony adduced by the Commonwealth, which was sufficient to take the case to the jury, and which furnished ample grounds upon which to base a verdict of guilt, we are not prepared to say that the verdict is flagrantly against the evidence, and therefore must let the verdict and judgment stand.

Judgment affirmed.