## Dixon v. Commonwealth.

April 28, 1942.

Ernest N. Fulton and S. L. Williams for appellant.

Hubert Meredith, Attorney General, and Wm. F. Neil, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY VAN SANT, COMMISSIONER—Reversing.

Appellant was convicted of the crime of manslaughter and sentenced to serve two years in the state reformatory. He asks reversal on the grounds that the court erred in refusing to permit the introduction of competent evidence and that the verdict is flagrantly against the law and the evidence. The first objection may be disposed of in a few words. Counsel for appellant did not make an avowal as to what the witness would have testified had he been permitted to answer the question which was objected to by the commonwealth's attorney. It is therefore impossible for us to determine whether the error was prejudicial to his substantial rights. We will not presume that it was. Maxey v. Commonwealth, 255 Ky. 330, 74 S. W. (2d) 336.

A proper consideration of the contention that the verdict is flagrantly against the law and the evidence requires a resume of the evidence. In the late afternoon of June 13, 1940, appellant drove from his home to Upton, a distance of about 3.4 miles. On his way he picked up Pat Sharp, who lives on the same road about 1½ miles from Upton. He visited several business places in Upton and finally went to a liquor dispensary but did not indulge in drinking anything intoxicating during that day or night. He stopped and was engaged in conversation with Cissell Priddy when deceased, Larue Lamkin, approached them. Lamkin was angry because the owner of the liquor dispensary had refused to sell him more liquor and stated that "He was going to throw a rock right through the God damn son of a bitch's window," and, that "he was going to throw a rock through the dispenser's car." He then challenged Priddy to fight. When Priddy declined to engage in a fight with Lamkin, the latter asked appellant if he wanted to take it up and the latter replied that he did not. Lamkin made several threats at that time, saying among other things that

there were three sons of bitches that he was going to get, "one was near the railroad, one is over there and the other right here," pointing to appellant. He likewise made the statement that "he was going to blow the damn town up." Dixon started to leave, whereupon Lamkin took a dollar bill out of his pocket and asked Dixon to call Biggie Miller, the deputy sheriff, to see if Miller would arrest him. He offered to pay either Priddy or Dixon if they would call Miller to make the arrest. Dixon got in his car preparing to drive off when Lamkin came up to the car, took hold of the door, and asked him if he was going to call Miller. Dixon replied that he was not, whereupon, Lamkin told him that if he attempted it he would never live to do so. Dixon departed and went to the home of Clyde Green where he called state patrolmen at Elizabethtown, explained Lamkin's condition and threats, and asked them to come to Upton and place Lamkin in restraint. Dixon remained at the Green home until the officers arrived. While there he obtained possession of a pistol owned by Green. He then drove back to the liquor dispensary which was on his way home. While he was there one of the officers whom he had called came back and asked him what they should do with Lamkin. Dixon replied that he did not care to have anything done with him as he did not want to cost him any money; that Lamkin was drinking and would be ashamed of himself when he sobered up; that all he wanted the officers to do was to keep Lamkin from hurting him. About that time the other patrolman drove up with Lamkin in custody and the officers said that they would take Lamkin to his home, which was on the same road and about one mile beyond the home of Dixon. One of the patrolmen drove off with Lamkin, the other followed in the patrol car. In a few minutes appellant accompanied by Sharp left for his home. Before they reached Sharp's residence they met the officers coming back. The latter informed appellant that Lamkin promised to go home and that he would not give them any more trouble and they permitted him to drive his own car. The patrolmen, Sharp, and appellant engaged in conversation for 10 or 15 minutes, at the conclusion of which appellant and Sharp drove on. Appellant delivered Sharp to the latter's home and had proceeded about half a mile beyond when, after passing over a hill and around a curve, he observed Lamkin's car parked on the right hand side of the road and Lamkin standing in the

road. The latter attempted to wave appellant down and hollered for him to stop. Appellant continued his course. Lamkin followed and, passing appellant, stopped his car in such manner as to block the road, causing appellant to stop. The time was 10:30 P. M. Lamkin got out of his car and walked back toward Dixon's car. Dixon testified that Lamkin had his hand in his pocket and he could see a "bulge or something that looked shiney and I thought he was going to shoot me." Dixon jumped from his car, fired five shots, all of which took effect in the body of Lamkin, killing him instantly. When Lamkin fell, he was approximately 15 feet to the rear of his own car. Dixon backed his car and turned around, stopped at the home of Pat Sharp, and in company with Sharp went to the home of Clyde Green. At appellant's request Green called the state patrolmen, informed them of the homicide and of appellant's intention to surrender. He then arranged for a doctor to go to the scene of the tragedy. The patrolmen responded immediately, drove to Green's residence, thence to the scene of the homicide. They found Lamkin's car a little to the right but practically in the center of the road, the body approximately 15 feet behind the car, the lights to Lamkin's car still burning, the motor running, and the left door open. They found no blood in or near Lamkin's car nor was there any evidence of a struggle except where the body was found. Lamkin was wearing overalls, which when searched, yielded several wrenches and pliers. They also found a dollar bill in his pocket. All of the above facts were completely corroborated except the circumstances attending the happening of the homicide itself.

If Dixon's testimony is true, we do not see how a stronger case of self-defense could have been proved. While neither the court nor the jury is required to accept defendant's explanation of the affray in the absence of eyewitnesses, nevertheless, if the physical circumstances in evidence are corroborative of his testimony and the circumstances proved are more consistent with his innocence than with his guilt, it was the duty of the court to instruct the jury to return a verdict of "not guilty." Carpenter v. Commonwealth, 287 Ky. 819, 155 S. W. (2d) 240. It was conclusively proven and is conceded by the commonwealth that appellant was on extremely friendly terms with Lamkin prior to the event above related and that he had no ulterior motive for taking his life. It is likewise conceded that Lamkin was in

constant and persistent pursuit of trouble. It was established beyond doubt that Dixon constantly and persistently sought to avoid trouble with Lamkin and that he had reason to believe that Lamkin, in his distorted frame of mind, might do him great bodily injury if the opportunity to do so were afforded him. No reasonable mind could adversely criticize appellant's decision to arm himself for protection against the threats of the deceased. The position and condition of the car and the body of the victim, as observed by the officers when they arrived at the scene of the shooting, were totally inconsistent with the theory that appellant was the aggressor in the affray. On the contrary, they show almost conclusively that the deceased was the aggressor. Lamkin's car was parked in such position as to make it impossible for appellant to drive past him, his motor was running, his lights were on, the left front door was open, his body fell 15 feet to the rear of his own car and facing in the direction of the Dixon car. Lamkin threatened to kill Dixon if Dixon called the officers. It appears from the testimony of the patrolmen that Lamkin's mind was fixed on the fact that Dixon had called the officers because he persistently asked the patrolmen if that were not true. It would be stretching the imagination beyond reason to conclude from these facts and circumstances that this homicide occurred in any manner other than that related by appellant. Even if Lamkin did not, as appellant testified, reach in his pocket for the ostensible purpose of producing a gun, in view of what had transpired earlier in the evening, Dixon had the right to assume that Lamkin was attempting to place himself in position to commit the act he had threatened against Dixon's life. In short, appellant was waylaid on a dark and infrequently traveled road by one whom he knew had threatened to take his life. Such circumstances would cause any prudent person to feel that his life was in danger and justify the action taken by the accused. We are, therefore, of the opinion that the evidence clearly establishes the plea of self defense, for which reason the court erred in overruling appellant's motion for a directed verdict of acquittal.

Wherefore, the judgment is reversed with direction to grant appellant a new trial, at the conclusion of which, if the evidence is substantially the same, the court will direct the jury to return a verdict of not guilty.

Whole Court sitting, except Judge Fulton.