## Cecil v. Commonwealth.

April 23, 1943.

E. B. Rose, H. M. Shumate and Moss Noble for appellant.

Hubert Meredith, Attorney General, and Frank A. Logan, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

On May 2, 1942, the appellant, Lester Cecil—who resided on a farm about six miles from Booneville, Kentucky—struck Will Barrett on the head with a brake stick, crushing his skull, and from the effects of which he soon died. At the trial of appellant on an indictment returned against him for murder he was convicted of voluntary manslaughter, and punished by confinement in the penitentiary for 15 years. His motion for a new trial was overruled, followed by this appeal. His counsel urge but one ground for reversal, which is—that the evidence was insufficient to sustain the verdict, and their motion for an acquittal instruction for their client should have been sustained.

The farms of appellant and his victim abutted on the south fork of Kentucky river, with a country wagon road along its banks; but there was a small triangular tract of land between the front part of their farms next to the river which was owned by Rose Gilbert, thus making the residences of appellant and his victim from a quarter to a half mile apart. The day of the homicide was Saturday, and appellant went to Booneville on that morning—which was about six miles distant from his home— to purchase a harrow, which he did. But, he could not transport it to his home in his automobile and the seller agreed to deliver it on the opposite side of the river where appellant could pick it up and carry it to his home. He returned from Booneville between 2 and 3 o'clock p.

m., on that day and after his arrival he geared his team to his wagon and drove to the point where the seller of the harrow was to deliver it for the purpose of bringing it home. He found it and placed it upon his wagon bed and tied it with the reins of the bridles of his team. He also had a brake stick at the side of the wagon which he ran through some portion of the harrow to aid in holding it on the wagon. He then returned to his home with the harrow and on reaching it he discovered the deceased standing at or near his yard gate.

While appellant was gone after the harrow the deceased came to his home with no person there, except appellant's wife, who testified that he inquired for her husband. Upon being informed by the witness that he was not at home deceased said: "His (defendant's) cattle has been in my field. This is one year I don't intend to put up with that. * * * You can get this now, I don't intend to put up with this. Your Daddy left his cattle over there." Then followed some conversation about the fence and deceased then said to witness: "You can tell him (her husband) what I said." The witness then stated that deceased was very angry. The farms of both parties to the controversy joined in their rear, and it was through some separating fence between them that the cattle on appellant's pasture escaped on to the adjoining pasture of the deceased. The latter, according to the witness, never entered appellant's yard, but stood at the front gate where he was standing when appellant, drove up with the harrow.

The relations between the parties had theretofore been friendly, and when appellant returned with the harrow and saw deceased standing at his gate he knew nothing about any controversy having occurred between deceased and appellant's wife, nor did he know that appellant was angry or entertained any sort of ill will against him. Between the Gilbert tract and that of appellant, next to the river there was a lane between 30 and 40 feet wide. Defendant's residence faced that lane. The lane ran at a right angle from the country road, along the banks of the river, toward the rear end of the Gilbert and Cecil farms, and we gather from the record that it extended no farther than where their lands joined, since beyond that point, as we have stated, the farms of appellant and the deceased joined. Neither the lane nor the country road was very much traveled—there being

grass between the wagon ruts in each, as well as beyond them. When appellant drove up to his residence with the harrow he testified that this occurred: ''When I drove up I said 'I am tickled to death that you are here to help me unload this harrow.' Bill started walking down that way. I said I will go down there and get some 2x5' to unload the harrow and I went down back some ways over the bank and got a 2x5 and set it on the rear end of the wagon. Bill was standing near the team. I began taking the brake stick out.'' He stated that the brake stick had been placed by him behind the harrow, as we have stated, so as to hold it in place, and that to unload the harrow he had to take the stick out, which he did, and set it by the side of the wagon. He was asked: ''Q. While you were untying the harrow and getting it ready to remove it from the wagon, tell the jury whether or not he (deceased) said anything to you?'' To which he answered: ''Yes, he come around in front of me near the front end of the wagon and said something about 'me and your woman has been in a terrible racket.' I asked him what over and he asked me if I knew where my cattle went and I told him I turned them out in the pasture, and he said they have been in my grass all day. I told him I was sorry that they had got in and he said he was getting darned tired of them getting in and I told him I had had the fence fixed and he said 'you told a damned lie about the fence being burnt.' I said I was down here below when the fire got out and he said Clyde come up there and helped put the fire out. He said I didn't fight the fire but that Clyde did. I said it got out in the woods and he said it's a damned lie. He said it come from Clarence Wilders. I said 'That makes twice you called me a damned liar,' and he said 'You are a damned liar.'

''I made a sort of move and he started back with his knife and I grabbed the stick. I punched at him with the stick and I said 'that's the second time you told me I was a damned liar,' and he said 'you are a damned liar' and I punched at him and he come right on toward me. I punched and just about missed him and he come right on at me. I hit him then. I didn't mean to kill him. I hit at him to protect myself.''

At the beginning the parties appear to have been on opposite sides of the wagon, which was stopped in the lane nearer to Gilbert's fence where the vehicular

traveled way therein was located; but deceased passed around the head of the team while hurling anathemas at appellant, and with an open knife in his hand, according to appellant and his wife, who were the only witnesses present and the only ones who testified as to what occurred at the time of the melee. During that time—according to both appellant and his wife—the former said to his victim: "Don't do that Bill," but nothing that appellant could or did do, either by words or punching deceased with the brake stick, had any effect towards stopping him from continuing his advance on appellant with his open knife in his right hand.

While the prosecution tried to prove that, perhaps, two licks were made on the left side of deceased's head, such testimony was vague and was given by laymen, none of whom were positive and it was contradicted by the physician who was later called by the coroner, and a number of other witnesses, including appellant and his wife.

Defendant and his wife carried the deceased from the place where he was struck to the rear of their residence where a well was located, and they washed the wound and applied some camphor which Mrs. Cecil found. Mrs. Barrett was promptly notified of what had happened and she immediately came to the Cecil home, and while there she stated, according to a number of witnesses (though denied by her), that she "told Bill not to go down and raise no racket about them cattle." After her arrival at the Cecil home appellant went after Dr. Becknell, who immediately went to the scene, but in the meantime Barrett had died and his body was later carried to his home. The physician testified that there had been but one lick struck on Barrett's head, and he also testified that he examined the premises where the difficulty occurred and saw the knife—later introduced as evidence and shown to be that of the deceased—lying by the side of the wagon near the pool of blood where the victim fell. A number of other witnesses also testified as to the position of the knife which they discovered soon after the fatal lick was struck, they being neighbors who had rapidly gathered in. Mrs. Barrett, at the trial, identified the knife as one belonging to her husband. Soon after the doctor left appellant sought out the sheriff of the county to surrender himself, but he did not find him at his office, and was informed he was at another place

in the county, to which appellant went and surrendered himself and was thereafter lodged in jail.

The commonwealth's testimony proved that defendant admitted striking the deceased, but stating at the same time that he had to do it to protect himself from death or great bodily harm at the hands of his victim. It also proved the local situation surrounding the scene, including the pool of blood where the deceased fell, and also introduced a witness to prove Mrs. Cecil had stated that she did not see any knife in the hands of the deceased at the time of the difficulty between him and her husband; but that witness did not contradict her testimony in any other particular, including the statement that the deceased was advancing upon her husband with his right hand raised. That contradiction of appellant's entire proof is the only one that we have been able to discover in all of the testimony introduced by the commonwealth. Neither did any of its witnesses testify to any circumstance contradicting in any manner the proof furnished by defendant in support of his plea of self-defense, save and except one statement that he made in the excerpt of his testimony supra wherein he said: "I made a sort of move." The commonwealth seeks to draw a guilty inference from that statement by supposing or surmising that the "move" made by appellant was an unauthorized one and, possibly, an aggressive one so as to deprive him of the right of self-defense.

In the first place such an inference is purely speculative, having no foundation other than surmise or suspicion. It is doubtful if such a conclusion could be legitimately drawn from such vagueness of expression, and certainly not when the testimony, of which the expression was a part, clearly showed that at the time the move was made the deceased was continuing his advance upon the appellant with his drawn knife.

We are aware of the rule frequently applied by this court to the effect that in the absence of other eyewitnesses to the commission of a crime the testimony of the defendant alone establishing an excuse for his crime will be weighed with great caution, and that in such cases testimony by the commonwealth establishing guilty circumstances contradicting the testimony of defendant on trial will be sufficient to sustain a verdict against him. On the other hand, when no such guilty circumstances appear in the record, and the testimony of defendant is

in accord with usual happenings under similar situations, we have uniformly upheld the defense relied on, and reversed the judgment of conviction, with direction to sustain the motion for an acquittal upon another trial if the testimony was substantially the same. The latest case sustaining such ruling by this court is that of Dixon v. Commonwealth, 290 Ky. 469, 161 S. W. (2d) 913. Some of the many preceding ones of the same tenor are Carpenter v. Commonwealth, 287 Ky. 819, 155 S. W. (2d) 240; Privitt v. Commonwealth, 271 Ky. 665, 113 S. W. (2d) 49; Minix v. Commonwealth, 266 Ky. 801, 100 S. W. (2d) 825, and a great number of others, thirteen of which are cited in brief for appellant. A reading of those opinions will show that in some of them the self-defense plea was not so conclusively sustained as was done in the instant case.

The statement by the defendant supra, saying that ''I made a sort of move,'' from which the commonwealth seeks to draw a guilty inference is just as susceptible to the conclusion that he moved backwards or to one side, or changed the way in which he was holding the stick, or some other entirely excusable move on his part. In view of the law that one charged with a crime is presumed to be innocent until he is proven guilty *beyond a reasonable doubt,* we conclude that no such vague conclusion as that advanced by the commonwealth should be indulged so as to override all of the express contradictory testimony in the case, and to thereby establish his guilt beyond such required doubt, and especially so when there is no testimony, or proven circumstance, to contradict the testimony of the only two eyewitnesses to the fatal occurrence, and which other proven circumstances by defendant tend to corroborate.

We, therefore, conclude that the court erred in not sustaining defendant's motion for a directed acquittal, and for which reason the judgment is reversed, with directions that if the testimony is substantially the same on another trial the instruction should be given, and for other proceedings not inconsistent with this opinion.

The Whole Court sitting.

Chief Justice Fulton dissenting.