### Wells v. Commonwealth.

Jan. .22, 1946.

OPINION OF THE COURT BY JUDGE SILER—Affirming.

Cecil Wells was convicted of the voluntary manslaughter of Oscar Beasley and sentenced to the peni-

tentiary for a term of five years. As grounds for reversal of the judgment of the trial court, Wells now contends that (1) there should have been a directed verdict of acquittal and that (2) the voluntary manslaughter instruction given by the trial court was erroneous and that (3) the rulings of the trial court on admission and rejection of evidence were erroneous.

The facts of this case we now summarize and review to the extent deemed necessary for a proper consideration of the grounds urged for reversal. Cecil Wells, Sam Hurt, Frank Hurt and Oscar Beasley, for whose death Wells now stands convicted, left Paint Lick in Madison County on Sunday afternoon about 4 p. m., October 22, 1944, in Wells' car to engage in rabbit hunting. They took along a double barreled shotgun owned by Wells' father and Wells drove the car. Wells, a veteran of the recent war, married and living with his wife and three children in Paint Lick, was a blacksmith, sawmill operator and farmer. The two Hurts and Beasley presumably engaged in farming in or about this farming community. They were all on friendly terms. This group of four first went to the community of Cartersville and the two Hurts and Beasley bought whiskey somewhere in that neighborhood amounting altogether to two quarts. They then engaged in some rabbit hunting but probably in more liquor drinking than rabbit hunting. For about four hours the group drove, drank and hunted around the countryside and part of the time Beasley was sitting or lying with Wells' shotgun out on the fender looking for rabbits to shoot and at one place along this odyssey Beasley shot this gun through the car window at a post or telephone pole as they continued their journey through the country. Around 8 p. m., this group decided it was time to disperse and they first let Sam Hurt out at his home somewhere near Paint Lick. Frank Hurt, Wells and Beasley continued in the car, crossed the Paint Lick bridge from Garrard County into Madison County and approached a private side road which leads from the main Lancaster-Richmond highway off through a field to Beasley's home. Somewhere in this vicinity Beasley allowed the shotgun to point in the direction of Wells and Wells turned it away from himself, made protest about it being pointed in his direction and mildly pushed or struck Beasley. Beasley retorted to the effect that he knew what he was doing and that he

had the gun "pointed right." Beasley then and there left the car and Frank Hurt and Wells proceeded in the car to Frank Hurt's home. As Frank Hurt and Wells continued in the car, some conversation ensued concerning the incident of Beasley pointing the gun towards Wells and Frank Hurt expressed the opinion that Beasley had not meant anything by what he said or did. After Frank Hurt had dismounted the car at his place, Wells drove back to the place where Beasley had dismounted and there Wells picked up Beasley to take him to the latter's home by way of the previously mentioned private side road through the field. Thereafter Beasley and Wells were alone in the car and were alone when Beasley was killed on that part of the trip to Beasley's home along the private side road through the open field. There was no eyewitness to this homicide, although a car containing several people, including Beasley's daughter, drove through the field several hundred yards behind the Wells car. The Wells car stopped briefly in that field, thereafter backed up a few feet, then pulled forward a short distance, turned around and passed the car occupied by Beasley's daughter and others going in the opposite direction. Beasley's body was found almost immediately by those in the second car at the side of the private roadway just a short distance from his home. The right side of his face and head was shot away. Beasley's pocket knife was on the ground a few inches from his hand. While no witness testified as to whether the knife was open or shut when found, Wells' brief asserts it was open and the Commonwealth's brief makes no denial. Beasley's money was intact, although some of it was on the ground and at least one of his pockets was turned inside out or partly so. The Wells car was later found to have human blood and brains in and about its right front seat, door, running board and fender. Wells sought out, after leaving the scene of the killing, a deputy sheriff, who went back to investigate the tragedy and Beasley's condition. After the deputy sheriff reported that Beasley was dead, Wells went to Richmond and surrendered himself voluntarily around midnight.

Wells related that when he was picking Beasley up to take him home down the side road he noticed there was some blood on Beasley's face and upon Wells' inquiry as to its cause, Beasley claimed Wells had hit him with something and had thereby scarred his face. How-

ever, Beasley got in the car and they started towards Beasley's home. While the two of them were alone in Wells' car on the last part of the trip going through the field to Beasley's home, Beasley resurrected, according to Wells, conversation about the gun pointing incident and about Wells striking him. Wells further related that Beasley showed his anger over the incident and remarked, "There is no God damned son of a bitch that can put a scar on my face and live," that Beasley thereupon got out his knife and was about to cut Wells, that Wells stopped the car and that a scuffle over the shotgun and knife ensued with the result that the shotgun was accidently discharged into the head of Beasley, who was partly outside the car at the time of the scuffling and shooting and who then fell or rolled the rest of the way out of the car door onto the ground, that Wells, being shocked and frightened and knowing Beasley had sons who might retaliate, immediately fled the scene and went to the deputy sheriff's home, as stated above, and later surrendered himself voluntarily at the jail in Richmond.

As a concluding statement to the foregoing review of the facts, it is fitting to say the evidence established the relative sizes of the accused and the deceased. Wells being a large man, more than 6 feet in height and around 225 pounds in weight, while Beasley was a small or medium man weighing around 130 pounds at the time of the difficulty.

In support of his contention that he was entitled to a directed verdict of acquittal, Wells cites two opinions of this court which adhere to the principle that in the absence of any eyewitness to a homicide, the accused is entitled to a directed verdict of acquittal if the physical facts and the other circumstances of the case strongly support the plea of innocence made by the accused. Dixon v. Commonwealth, 290 Ky. 469, 161 S. W. 2d 913, and Cecil v. Commonwealth, 294 Ky. 44, 170 S. W. 2d 882. We do not now depart from the principle of those two decisions, but we do distinguish the established evidence in this case from the same adduced in the Dixon and Cecil cases, supra. In each of those cases the deceased, in the presence of others, became threatening against his killer and each was shown by the accrued circumstances to have been an aggressor before he was slain. In the present case, no witness, except Wells

himself, testified about any threat made by Beasley at
any time. The nearest approach to a threat was the
statement charged to Beasley to the effect that he had
the shotgun "pointed right" when it was carelessly al-
lowed to point in the direction of Wells. That state-
ment might have meant the deceased considered that he
was handling the gun in a skillful way rather than in a
way intended to be harmful to the person of Wells.
While it is true Beasley was drinking and acting in the
indiscreet manner often seen in those who come under
the influence of liquor, yet we are unable to find anything
in his conduct up to the time he was alone with Wells
which would indicate any belligerency or any hostility
to his companions in general or to Wells in particular.

The physical facts and other circumstances of the
case are hardly as consistent with Wells' protested in-
nocence as with his pronounced guilt, as decided by the
jury at the trial. Some of these facts and circumstances
are that Wells himself was the first to become somewhat
ruffled in temper as shown by his striking Beasley for
his careless handling of the gun, that Wells ran away
immediately after the shooting, that the killing occurred
as Beasley was halfway out of the car, which could
indicate Beasley was trying to get away from Wells, that
the pockets of Beasley were turned inside out or partly
so, which could indicate the knife of Beasley found by
his side was placed there after he was killed. All these
facts and circumstances do not strongly support Wells'
theory that Beasley, without provocation, was attempt-
ing to kill Wells and that they scuffled over weapons
with the result that the gun accidently discharged and
killed Beasley.

While the evidence used to weave a net of guilt
around Wells was all circumstantial in nature, yet on
the whole we think it was somewhat more consistent
with his guilt than with his plea of innocence. This
court is not authorized to reverse a judgment merely
because such judgment is founded upon circumstantial
evidence. Strong v. Commonwealth, 297 Ky. 591, 180
S. W. 2d 560; Hightower v. Commonwealth, 286 Ky. 561,
151 S. W. 2d 39; Harlan v. Commonwealth, 253 Ky. 1,
68 S. W. 2d 443; Russell v. Commonwealth, 276 Ky. 38,
122 S. W. 2d 1009.

The second ground for reversal urged on this ap-
peal is that the instruction on voluntary manslaughter

did not use the words, intentional and wilful. The court used the consolidated form of homicide instruction which submitted questions of murder, voluntary manslaughter and involuntary manslaughter all in a single instruction. The word, wilful, was used in such a way as to make it apply to both murder and voluntary manslaughter, although the word, wilful, was used but one time. In a subsequent instruction the word, wilful, was defined to mean intentional. This combined or consolidated form of instruction in homicide cases has been upheld by this court. Wooten v. Commonwealth, 299 Ky. 598, 186 S. W. 2d 652. Also, see model of combination form in Stanley's Instructions to Juries, p. 1148. Upon full consideration of the body of instructions given upon the trial of this case, we have not found them prejudicially erroneous nor detrimental to the substantial legal rights of the accused.

The last ground urged for reversal is that the trial court erred in its rejection and admission of certain evidence. Specifically our attention has been directed at Wells' attempt to introduce evidence to refute the Commonwealth's evidence which tended to establish a general custom of keeping the gates closed in the private side road leading to Beasley's home. Wells had left the gates open for his return trip and the Commonwealth's theory seems to have been that Wells' purpose in so doing was to facilitate a quick flight after committing murder. The court did not permit Wells to show that the custom was to leave the gates open on a trip of going in followed by immediate return. Since the trial jury rejected the Commonwealth's theory of murder and adopted the theory of voluntary manslaughter done in sudden affray, it·is apparent the evidence about leaving the gates open was not a thing of great weight. The jury rejected all of it entirely. Our conclusion is that the trial court committed no reversible error in these rulings relating to evidence.

While we are not happy to see this young man of a family, a former soldier, enmeshed in his present trouble, yet we are confronted with a decision of his selected jury finding him guilty and a search of the record discloses no reversible errors committed against his substantial rights on this trial.

Wherefore, the judgment is affirmed.