## Barker v. Commonwealth.

February 11, 1947.

James S. Forester, Judge.

14

G. E. Reams for appellant.

Eldon S. Dummit, Attorney General, and Guy H. Herdman, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—Affirming.

Appellant, David (Bill) Barker, was indicted for the murder of Joe Roark, whom appellant admittedly shot fatally on the night of July 22, 1946. A jury found him guilty of manslaughter and imposed a sentence of imprisonment for ten years. On appeal it is contended that the proof showed that Barker acted in his necessary self-defense, hence the court should have sustained his motion for directed verdict, and that the verdict was flagrantly against the evidence.

Barker lived at Dione in Harlan County; Herman Huff and Henry Williams, who were with him at the time of the homicide, lived in the same neighborhood. Huff owned an automobile, and in the afternoon of the day mentioned Huff and Barker went to Cumberland in Huff's car, thence to Frog Level where Williams joined them, and all went to a skating rink and skated for some time, finally winding up at Cliff House around 11 p. m. Deceased, Roark, was at the roadhouse; he had driven up in a truck, and had with him an elderly man named Ison, who was drunk, and two boys named Cornett. As all parties were about to leave Huff concluded that Roark was about to drive off and leave "the old man." He called to Roark not to leave him and went around the truck, as he says, to help the old man in, and as he neared the truck Roark struck him on the head with something he thought was a hammer, later found at the scene of the homicide. This caused a scalp wound about three inches in length, and a considerable flow of blood.

Immediately thereafter Roark and his companions left Cliff House, going toward Roark's home. According to the testimony, within five minutes Huff left in his car with Barker and Williams. It is of importance at this point to say that the proof shows that the homicide occurred on what is called Line Fork road, which leaves the main highway at a point not far from Cliff House, and about 300 yards from where Line Fork road leaves the main highway. Barker and his companions did not live on Line Fork, but on the main highway. They say that they turned off this highway "the way the truck was going" to go to a Mrs. Stoker's by a prearrangement, for what purpose was not developed.

Huff was driving his car, appellant on the right side and Williams between the two. After Huff had traveled about 300 yards the party observed a truck standing in the narrow road in such a way as to prevent passage of Huff's car, and he, Huff, told Barker to call to the driver of the truck "to move on or pull over so they could get by." Appellant's proof is to the effect that as he started to open the door, and had gotten his foot on the running board, some one struck him on the side of the neck with a hammer, and knocked him back against Williams. When this occurred Barker reached in the glove compartment and procured a pistol and "as I turned around I fired a shot out of the car, and he was coming at me again, and I couldn't get back through to the door, and I tried to get past him to keep him from hitting me; about the time I hit the ground he hit me in the top of the head with a hammer, and as I started to go back I said 'oh, Lord,' and all I remember was the fire of the gun."

It developed that Roark was shot once, the bullet entering about the right shoulder and was removed from under the left shoulder. It is shown that Barker placed the pistol in Huff's car, and Huff and his companions placed Roark's body in the car to take him to a doctor, but he was dead. Some one called "the law" and a deputy sheriff arrived in a short time and took charge.

Huff testified on behalf of appellant and there was little difference in their versions. Noticeable in Huff's testimony was the fact that it was never developed why his party had agreed that they would, rather than going

home after the rencounter at Cliff House, go to Mrs. Stokers, who lived on the Line Fork road beyond the point where the homicide occurred. As bearing on the question as to whether the homicide was in good faith committed in self-defense, it cannot be overlooked that prior to the homicide, Huff had told Barker where his (Huff's) pistol was located, in the glove compartment, and told him where it could be gotten, and because of some defect in the mechanism of the compartment instructed Barker how to open it; "I told him it had been sprung and if anybody wanted to they could grip it and open it." When these instructions were given is not developed, and the jury may have inferred from immediately preceding circumstances that it was after Huff had been struck at the Cliff House.

The Commonwealth introduced Williams, who was in the car with Barker and Huff. His version does not materially differ from what has been recited. He is the only person who indicated when the plan to go to Mrs. Stoker's was formulated. After Huff was struck at Cliff House, Williams suggested that something be done about the wound on Huff's head, "I said we will patch it up when we get home. He said he wanted to go to Mrs. Stokers. He went on and started up the Sand Hill." He fixes the time when Huff's car left after Roark's departure at about five minutes.

The Cornett boy, who was with Roark and introduced by the Commonwealth, threw little light on the matter. He does say that when Roark pulled up the mountain he stopped and got out of the truck and gave him a jack lever "and told me to help him;" he does not say what he was to help him do, and this matter was not pursued, except that he said that Roark did not say "we will go back and knock them in the head," as was said by one witness who was nearby in his home.

Huff, in testifying as to what happened after he was struck, said that he had started to Mrs. Stokers on Sand Hill. "It was on the way the truck was going, it was there anyway." He asked Barker to "holler and let us by." He says that he had no intention of following Roark. It was fairly shown that the Line Fork road was narrow, and there were only a few places where

cars could readily pass each other, and Huff knew it was a very narrow road.

The hammer and lever mentioned in the testimony were filed as exhibits, but are of little use to us because if there was blood on the hammer when found at the point of the homicide, time has removed traces of it. This hammer was picked up by the deputy sheriff who arrived shortly after the homicide. He thought the car and truck were within about 40 or 50 feet of each other, but there was evidence that the car had been turned partly after placing Roark's body in it. He said he found the hammer lying by a pool of blood "where they said the man was killed;" he saw blood on the hammer, but did not see any hair, as another witness had testified.

Counsel for appellant has submitted an exhaustive brief in furtherance of his contention that all the proof shows that appellant acted in self-defense, and cites us a number of our opinions in which we have directed reversals of judgments where we concluded that the plea of self-defense was clearly and thoroughly established: Privitt v. Commonwealth, 271 Ky. 665, 113 S. W. 2d 49; Carpenter v. Commonwealth, 287 Ky. 819, 155 S. W. 2d 240; Dixon v. Commonwealth, 290 Ky. 469, 161 S. W. 2d 913.

There can be no doubt that if the facts were the same in this as in the cases cited, and others which might be, the principle that it is the duty of the court to reverse when convinced that the plea was well established, would prevail. As manifesting what is usually true that the facts in no two cases are identical, the Privitt case may be noted where we found that the proof did not show that appellant, or one charged with him, had fired the fatal shot.

There are other principles of law that are well established; one that the jury may consider circumstances from which it may reasonably infer guilt. Another is that when one charged with homicide admits the commission of the act it becomes incumbent on him to satisfy the jury that the act was committed in self-defense, if that be the defensive plea. Here there are circumstances from which the jury might well have concluded that Huff and his companions, following the rencounter at Cliff House, had then agreed to leave the highway and follow

Roark's truck up the road towards Mrs. Stokers. It may be also inferred that Roark stopped and waited for them —though there is no proof showing that he had reason to believe they were to take that road—and a mutual combat followed. In such event the defendant would have been deprived, unless other circumstances prevailed, of the self-defense plea.

Another circumstance was that of Barker's ready knowledge of the place and working of the 44 calibre pistol in the glove compartment. The imparting of this knowledge to Barker, and leaving the main highway, are assuredly circumstances from which the jury could infer that the plea of self-defense was not well founded. Aside from these not better explained circumstances, there are some physical facts, one for instance tending to show that the killing did not occur at the place and in the manner detailed by appellant and his witnesses.

The rule in cases of this character is that where there is no denial of the firing of the fatal shot, or doing the act which caused the death or injury, the only question for the jury is whether or not the one charged, committed the act in good faith in self-defense, Farris v. Commonwealth, 295 Ky. 324, 174 S. W. 2d 415, and it is in such cases incumbent on defendant to convince the jury that the act was excusable. Bigby v. Commonwealth, 273 Ky. 335, 116 S. W. 2d 659.

We are of the opinion that the proof was sufficient to take the case to the jury, and that the verdict is not flagrantly against the evidence.

Judgment affirmed.